CARSON PETROLEUM COMPANY *v.* VIAL, SHERIFF AND TAX COLLECTOR, ET AL.

No. 306. Argued February 28, 1929.—Decided April 8, 1929.

*Messrs. George M. Burditt* and *John K. Murphy,* with whom *Messrs. Wm. E. Leahy, Harry A. Newby,* and *Harold A. Moise* were on the brief, for petitioner.

*Mr. Harry P. Sneed,* with whom *Messrs. A. P. Frymire, R. R. Ramos,* and *C. S. Lagarde* were on the brief, for respondents.

Mr. CHIEF JUSTICE TAFT delivered the opinion of the Court.

This was a petition by the Carson Petroleum Company, a corporation of Delaware, to enjoin Leon C. Vial, sheriff and tax collector of the Parish of St. Charles, Louisiana, R. A. De Broca, assessor for the Parish, and the Louisiana Tax Commission, from laying and levying against it an alleged illegal assessment of duties on a quantity of oil in storage tanks at St. Rose in the Parish. They were ad valorem duties levied on all the property of the petitioner subject to taxation. The taxation was objected to because it was deemed an interference with interstate and foreign commerce.

The District Court granted the injunction on the ground that the oil was in transit from another State to a foreign country, and was halted only temporarily at St. Rose, and had no situs in the Parish or State. The Supreme Court of Louisiana reversed the decree and ordered that the tax be collected, with the penalties imposed by law.

**166 La. 398.** There is no dispute about the facts. We avail ourselves of the statement made by the Chief Justice of the Supreme Court of Louisiana, which is a clear and fair representation of the case:

" The Petroleum Import & Export Corporation is a subsidiary of the Carson Petroleum Company, and owns and operates the system of tanks and pumping equipment for receiving the contents of the railroad tank cars of oil into the tanks owned by the Petroleum Import & Export Corporation and afterwards loading it into ships for export. The Port of New Orleans has no facility or equipment for assembling or receiving from railroad tank cars cargoes of oil and loading it aboard ships for export. The tanks and equipment at St. Rose, a few miles above New Orleans, were constructed for that purpose. No oil is sold at St. Rose except what is exported. The only business conducted there is the unloading of oil from railroad tank cars into the storage tanks and the loading of the oil from the storage tanks aboard the tankers for shipment to England, France, and other foreign ports. The oil is bought by the Carson Petroleum Company from the refiners in the Mid-Continent Field, comprising Kansas, Oklahoma and Texas, and is shipped to St. Rose, Louisiana, in railroad tank cars consigned to the Carson Petroleum Company. The shipments are not on through bills of lading, but on an export rate, which is lower than the domestic rate. The oil is a higher grade of gasoline than is used in this country generally, and is made especially for export, because the automobiles in England, France and other foreign countries require a higher grade of gasoline than that which is used in this country. The Carson Petroleum Company takes orders for cargoes of oil from the foreign buyers, who charter the vessels to transport the oil from St. Rose to the foreign ports. The company always has orders on hand in excess of the quantity of oil at St. Rose, and buys the oil in the Mid-Continent Field for the pur-

pose of filling orders already received from the foreign buyers. The oil in each railroad tank car, however, is not segregated or assigned or destined to any particular cargo or shipment abroad, but is pumped into the large storage tanks, having the capacity of many tank cars, and is held in the tanks until a ship arrives, or until a sufficient quantity of oil is accumulated to make up a cargo. A ship carries from two to three million gallons; hence it takes 300 to 500 railroad tank cars, or 10 to 16 trains of tank cars, to make up a cargo of oil. The buyers are allowed a ten per cent leeway on the quantity of oil bought for each shipment; which, as we understand, means that, if the capacity of the ship is either more or less than the quantity of oil contracted for, the buyers can demand a delivery of the ship's capacity, at the contract price of the oil per gallon, provided the quantity shall be not more than ten per cent above or below the quantity contracted for. A delivery of the oil thus sold is made by loading the oil aboard the ship chartered by the buyer. Until the oil is thus loaded aboard a ship it belongs to the Carson Petroleum Company and is insured in the name of the company, loss payable to the company. There are times when an accumulation of oil in the tanks is awaiting the arrival of a ship, and at other times a ship is awaiting the accumulation of a sufficient quantity of oil to make up a cargo. In order to save demurrage on ships, which amounts to $1,500 or $2,000 per day on a ship, the Carson Company endeavors to have a sufficient quantity of oil on hand at St. Rose to fill each order promptly on arrival of the ship. On account of the demurrage charges on tank cars, as well as on steamships, it would be impracticable to carry on the export oil business by any other method than by storing the oil in large storage tanks as the train loads of oil arrive, and shipping from the accumulation when the ships arrive. The oil is shipped from the storage tanks in the same condition in which it was received from the tank

cars, without being treated in any way. The oil is never kept on hand at St. Rose any longer than is necessary. The quantity on hand is always awaiting either the arrival of a ship or the accumulation of a sufficient quantity to load a ship."

The Oil Company asserts that the interstate and foreign shipment of the oil, from the refineries in the Mid-Continent Field, into and across the State, and across the sea to the foreign ports, is a continuous interstate and foreign shipment, notwithstanding the stoppage and storage of the oil at St. Rose, where it had to await either the arrival of a ship or the accumulation of a sufficient quantity of oil to load a ship. On the other hand, the state authorities claim that there were two separate shipments—the one which ended when the tank cars arrived and were unloaded at St. Rose, and the foreign shipment, which began when the oil was loaded aboard ship for a foreign port. Hence they contend that while the oil was stored in the tanks at St. Rose, under the protection of the state and local government, it was subject to state and local taxation, even though intended and prepared for exportation.

The crucial question to be settled in determining whether personal property or merchandise moving in interstate commerce is subject to local taxation is that of its continuity of transit. The leading case is that of *Coe* v. *Errol,* 116 U. S. 517, in which Mr. Justice Bradley for this Court laid down the principles that should be applied. It was a case of floating logs. There were two lots, one where the logs were cut in Maine, and were floated down the Androscoggin on their way to Lewiston, Maine, but after starting on the trip were detained for a season in New Hampshire by low water. It was held that they were free from local taxation in New Hampshire because they had begun the interstate trip and the cause of detention was to be found in the necessities of the passage and trip back to Maine, which was held to be continuous.

This ruling, which was by the state court of New Hampshire, was approved by this Court. But, in respect to the other lot, this Court found that the logs were gathered in New Hampshire in what the Court termed an " entrepôt," looking to ultimate transportation to another State, but that when taxed they had not started on their final and continuous journey, and hence were not in interstate commerce, and were taxable.

In *Champlain Realty Co.* v. *Brattleboro,* 260 U. S. 366, logs gathered on the West River in Vermont for a destination in New Hampshire, were held not taxable in Vermont, though detained for a considerable time by a boom at Brattleboro to await subsidence of high water in the Connecticut River. It was held that as the interruption was only to promote the safe or convenient transit, the continuity of the interstate trip was not broken, as shown in *State* v. *Engle,* 34 N. J. L. 425; *State* v. *Carrigan,* 39 N. J. L. 35, and in *Kelley* v. *Rhoads,* 188 U. S. 1, where sheep driven 500 miles from Utah to Nebraska, traveling 9 miles a day, were held immune from taxation in Wyoming, where they stopped and grazed on their way.

In *Hughes Brothers Co.* v. *Minnesota,* 272 U. S. 469, pursuant to a contract of sale, logs cut were gathered on the Swamp River, in Minnesota, by the vendors and were floated by river to Lake Superior, there loaded on to the vendee's vessels, and transported to their destination in Michigan. This Court said, p. 475:

" The conclusion in cases like this must be determined from the various circumstances. Mere intention by the owner ultimately to send the logs out of the State does not put them in interstate commerce, nor does preparatory gathering, for that purpose, at a depot. It must appear that the movement for another State has actually begun and is going on. Solution is easy when the shipment has been delivered to a carrier for a destination in another

State. It is much more difficult when the owner retains complete control of the transportation and can change his mind and divert the delivery from the intended interstate destination, as in the *Champlain Company* case. The character of the shipment in such a case depends upon all the evidential circumstances looking to what the owner has done in the preparation for the journey and in carrying it out. The mere power of the owner to divert the shipment already started does not take it out of interstate commerce, if the other facts show that the journey has already begun in good faith and temporary interruption of the passage is reasonable and in furtherance of the intended transportation, as in the *Champlain* case. Here the case is even stronger in that the owner and initiator of the journey could not by his contract divert the logs after they had started from Swamp River without a breach of contract made by him with his vendee, who, by the agreement of sale, divided with him the responsibility for the continuous interstate transportation."

The principle of continuity of journey is shown in *Ohio Railroad Commission* v. *Worthington,* 225 U. S. 101, where coal from the Ohio mines, intended for transportation on the lakes and stored for some weeks or months on docks in Cleveland for delivery beyond the lakes, was held to be subject to interstate rates. So in *Western Oil Co.* v. *Lipscomb,* 244 U. S. 346, in which, speaking of the effect of billing and rebilling in causing a break in the trip, it was said, p. 349:

" Ordinarily the question whether particular commerce is interstate or intrastate is determined by what is actually done and not by any mere billing or plurality of carriers, and where commodities are in fact destined from one State to another, a rebilling or reshipment en route does not of itself break the continuity of the movement or require that any part be classified differently from the re-

mainder. As this court has often said, it is the essential character of the commerce, not the accident of local or through bills of lading, that is decisive."

An instance of interruption of railroad transportation is *Bacon* v. *Illinois,* 227 U. S. 504. Bacon, the owner of the grain, and the taxpayer, had bought it in the South and had secured the right from the railroads transporting it to remove it from their custody to his private grain elevator in Illinois, where, for his own purpose, he proceeded to inspect, weigh, clean, clip, dry, sack, grade or mix it, and had power, under his contract with the carriers, either to change its ownership, consignee or destination or to restore the grain, after the processes mentioned, to the carriers to be delivered at the destination in another State according to his original intention. The question was whether the removal of the grain to his private elevator interrupted the continuity of the transportation and made the grain subject to local taxation there. It was held that it did; that the grain was locally dealt with in the interest of the owner, while it was in his custody and was subject to his complete disposition for a collateral business purpose of his own.

Another case is that of *General Oil Co.* v. *Crain,* 209 U. S. 211. The company conducted a large oil business in Memphis, where it gathered from the North much oil and maintained an establishment for its distribution. It had tanks of various sizes, from which the oil was put in barrels or other small vessels to be sold locally or in other States, or to fill orders already received from customers in Arkansas, Louisiana and Mississippi. For years the company had unloaded its oil from its tank cars on arrival into large stationary tanks indiscriminately, and had sold and distributed it as required in its business. After a time, in order to escape the local inspection tax, part of the oil was deposited in a stationary tank No. 1

marked " Oil already sold in Arkansas, Louisiana and Mississippi," while the local oil and that yet to be sold was kept in other tanks. The oil in No. 1 was divided, according to the orders already received, into barrels and larger containers, to be forwarded by rail to customers in the three States named. It was contended that oil of tank No. 1 was on a continuous trip through Memphis from sources in the North to the ascertained customers in Arkansas, Louisiana and Mississippi, and was not taxable at Memphis. It was held that the doings of the company, in thus separating the oil after it reached Memphis into various amounts in different containers, was itself a local business in Memphis, and that the delivery into Memphis of the oil, and its subsequent shipment made two separate interstate shipments and permitted local taxation on the oil while it awaited the second shipment. The Court seemed to regard the redistribution of the oil at Memphis as a rest interrupting the journey, and the Memphis yard for the tanks as an assembling entrepôt like that described by Mr. Justice Bradley in *Coe* v. *Errol*.

The Court was divided and there was very vigorous dissent. The case has caused discussion, and it must be admitted that it is a close one and might easily have been decided the other way. The result was probably affected by the impression created by the original situation and the somewhat artificial rearrangement of tanks in a large entrepôt for redistribution of oil to avoid previous taxability.

We do not think, in deciding the case at bar, that we should give the *Crain* case the force claimed for it by the court below and by counsel for the State. Since its decision this Court has had to consider several cases where there was transshipment of the commodity from local carriage in a State to a ship at an export port and conveyance thence to a foreign destination. There has been a liberal

construction of what is continuity of the journey, in cases where the Court finds from the circumstances that export trade has been actually intended and carried through.

In *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission,* 219 U. S. 498, cotton oil cake and meal destined for export was bought by the intending exporter in Texas, Oklahoma and Louisiana. It was shipped to him on bills of lading and way bills showing the point of origin in those States and the destination at Galveston. The purchases were made for export, there being no consumption of the products at Galveston. His sales to foreign countries were sometimes for immediate and sometimes for future delivery, irrespective of whether he had the product on hand at Galveston. At times he had it on hand. At other times orders must be filled from cake or meal to be purchased in the interior or then in transit to him. When the cake reached Galveston, it was ground into meal and sacked by the exporter, and for the meal thus ground, and such meal as had been bought in ground form, he took out ships' bills of lading made to his order. The Court said, p. 526:

" . . . the manufacture or concentration on the wharves of the Terminal Company are but incidents, under the circumstances presented by the record, in the transshipment of the products in export trade and their regulation is within the power of the Interstate Commerce Commission. To hold otherwise would be to disregard, as the Commission said, the substance of things and make evasions of the act of Congress quite easy. It makes no difference, therefore, that the shipments of the products were not made on through bills of lading or whether their initial point was Galveston or some other place in Texas. They were all destined for export and by their delivery to the Galveston, Harrisburg and San Antonio Railway they must be considered as having been delivered to a carrier for transportation to their foreign destination, the

Terminal Company being a part of the railway for such purpose. The case, therefore, comes under *Coe* v. *Errol*, 116 U. S. 517, where it is said that goods are in interstate, and necessarily as well in foreign, commerce when they have 'actually started in the course of transportation to another State or delivered to a carrier for transportation.' "

In *Texas & New Orleans R. R.* v. *Sabine Tram Co.*, 227 U. S. 111, the question was whether the rates charged on shipments of lumber on local bills of lading from one point in Texas to another, but destined for export, were intrastate or foreign commerce. The exporter purchased the lumber from other mills in Texas with which to supply its sales in part. It did not know, when any particular car of lumber left the starting point, into which ship or to what particular destination the contents of the car would ultimately go, or on which sale it would be applied; this not being found out until its agents inspected the invoice mailed to and received by him after shipment. The lumber remained after arrival at the shipping port, in the slips or on the dock, until a ship chartered by the exporter arrived, when the exporter selected the lumber suited for that cargo and shipped it to its destination. There was no local market for lumber at the port of shipment, the population of which did not exceed fifty, and the exporter had never done any local business at that point. This Court held that the shipments to the point of shipment from other points of Texas were in interstate and foreign commerce and should pay rates accordingly. The Court said, p. 126:

" The determining circumstance is that the shipment of the lumber to Sabine was but a step in its transportation to its real and ultimate destination in foreign countries. In other words, the essential character of the commerce, not its mere accidents, should determine. It was to supply the demand of foreign countries that the lumber was purchased, manufactured and shipped and to give

it a various character by the steps in its transportation would be extremely artificial. Once admit the principle and means will be afforded of evading the national control of foreign commerce from points in the interior of a State. There must be transshipment at the seaboard, and if that may be made the point of ultimate destination by the device of separate bills of lading, the commerce will be given local character, though it be essentially foreign."

Again this Court said, p. 130:

"And the shipment was not an isolated one but typical of many others, which constituted a commerce amounting in the year 1905 to 14,667,670 feet of lumber, and in the year 1906, 39,554,000 feet. Nor was there a break, in the sense of the Interstate Commerce law and the cited cases, in the continuity of the transportation of the lumber to foreign countries by the delay and its transshipment at Sabine. *Swift & Co.* v. *United States,* 196 U. S. 375. Nor, as we have seen, did the absence of a definite foreign destination alter the character of the shipments."

See also *Railroad Commission* v. *Texas & Pacific Ry.,* 229 U. S. 336; *Spaulding & Bros.* v. *Edwards,* 262 U. S. 66, 70.

We do not think the *Sabine Tram* case can be distinguished from the one before us. It has been suggested that, in the present case, there was a failure to fix the exact point of destination abroad before shipment, and that this prevents the continuity required in a continuous exportation. But there was the same indefiniteness on this point in the *Sabine Tram* case. Then, it is said, there was no separation of the various shipments of oil from the interior points to the tanks and thence to ships at the port of shipment. But in the *Sabine Tram* case cars of lumber were sent to the transshipment point without regard to the filling of one order or another. In both cases the delay in transshipment was due to nothing but the failure of the arrival of the subject to be shipped at the same

time as the arrival of the ships at the port of transshipment. The use of the tanks at the point of transshipment can not be distinguished from the storing of the lumber on the docks, or in the slips between them, till the vessel to carry it should be ready. The quickness of transshipment in both cases was the chief object each exporter plainly sought. In both cases the selection of the point of shipment and the equipment at that point were solely for the speedy and continuous export of the product abroad, and for no other purpose. No lumber or oil was sold there but that to be exported. There was no possibility of any other business there. Whatever hesitation might be prompted in deciding this case, if the *Crain* case stood alone, the effect of the decisions of this Court since is such as to make it inapplicable to the case before us.

*The judgment is reversed.*

MR. JUSTICE MCREYNOLDS and MR. JUSTICE SANFORD are in favor of affirming the judgment on the authority of *General Oil Co.* v. *Crain*, 209 U. S. 211.