**MISSOURI PAC. R. CO. v. SCHNIPPER, County Treasurer, et al.**

No. 4257.

District Court, E. D. Illinois.
April 3, 1931.

lection of a tax of $3,403.80 on railroad ties owned by the complainant and found by the tax assessor of Centreville township on April 1, 1929, in the yards and plant of the T. J. Moss Tie Company at Valley Junction, Centreville township, St. Clair county, Ill.

As grounds for the injunction the plaintiff alleges that the ties, when assessed, were in transit in, and subjects of, interstate commerce; that they were being shipped under the provisions of lawful rate schedules and tariffs permitting ties to be shipped in interstate commerce with privilege of stop-over for creosoting treatment; that they were at the plant of the T. J. Moss Tie Company by virtue of such stop-over privilege and in process of treatment at the time they were so assessed; that they were delayed no longer at the said plant than was necessary for the purpose of creosoting; that they, while at said plant and when assessed, were subjects of interstate commerce and were not taxable as part of the general mass of property in the state of Illinois, and that said tax directly interferes with and constitutes a burden upon interstate commerce in violation of clause 3, section 8, of article 1 of the federal Constitution, and is therefore illegal.

The facts shown by the evidence taken on the trial of the merits of the case were as follows: The Missouri Pacific Railroad Company is a corporation organized and doing business under the laws of the state of Missouri with lines of railroad in various states, including Illinois, Missouri, and Arkansas. It purchases at points in Louisiana, Oklahoma, Arkansas, and Missouri cross-ties for use in building and maintaining its lines of railroad in the various states. At the beginning of each year, responsible officials of the plaintiff, after receiving reports from maintenance of way officials and employees on the various districts and divisions of the railroad, prepare and submit to its general office estimates of the number and classes of ties that will be required during the year on the respective divisions of its lines. Based on the estimates so arrived at, representatives of the company proceed to make contracts for ties at available points in Arkansas, Louisiana, Oklahoma, and Missouri. Pursuant to such estimates ties are accumulated on plaintiff's lines in said states, inspected, and received. Thereafter they are shipped from points where received to the plant of the T. J. Moss Tie Company at Valley Junction, Ill., where they are treated with creosote, and thence, after treatment, to various points on

Whitnel & Browning, of East St. Louis, Ill., for plaintiff.

F. J. Tecklenburg, of Belleville, Ill., for defendants.

WHAM, District Judge.

By its petition the plaintiff seeks to enjoin the defendants from enforcing the col-

plaintiff's lines for use. The plaintiff neither buys nor owns any ties for resale nor for any purpose other than for its own use. When shipments of ties are made from point of origin to the creosoting plant, the final destination beyond the plant of neither the shipment nor of any tie in the shipment has been definitely determined. It is known, however, that the ties made of certain woods will go to certain divisions for certain specific uses, and that all will be forwarded after treatment from the plant for use at some point on plaintiff's lines pursuant to the intention at time of shipment.

The ties are carried into and out of the plant by the plaintiff on its own rails. At the plant the plaintiff maintains a supervisor who records the shipments in and out. At the first of each month he receives from the plaintiff's general office a setup for shipment of ties from the plant during the month corresponding to plaintiff's requirements on the various operating divisions, which he fills out of plaintiff's ties at the plant, which have been treated and are ready to be moved. In addition to recording and supervising the incoming and outgoing shipments of ties, the supervisor superintends the delivery of ties to the plant for treatment and determines whether the ties, when received at the plant, are ready for treatment or must be yarded for drying or air seasoning. Ties cannot be treated until thoroughly air-seasoned. Air-seasoning of a tie is shown by the evidence to require from three to nine months. When received at the plant some of the ties are air-seasoned and the remainder are in varying stages of air-seasoning. The unseasoned ties must be, and are, stacked in the yards until properly seasoned. Wet ties must be yarded until dry. A tie which is dry and properly seasoned can be treated with creosote in the course of a few hours.

About 20 per cent. of the ties, upon arrival at the plant, are treated immediately and shipped out as soon as treated. The others remain in the yards for varying periods of time. The average length of time the ties remain in the plant or the yards of the plant is more than three months, but not more than four months. The records of the tie company show that some ties remain at the plant for a period of a year or more and very considerable numbers for varying periods in excess of six months. It is estimated that the number of plaintiff's ties at the T. J. Moss Tie Company plant maintain an approximate average throughout the year of 300,000, with a fairly equal number coming in and going out in the course of the year. There is frequently a great variance, however, between the number coming in during a given month, or other given period within a year, and the number going out in the course of the same period. The ties treated at this plant are used in Illinois, Missouri, and other states, but the evidence does not disclose what proportion of the ties are used in Illinois and what proportion elsewhere.

A duly published through rate from point of origin to final destination, with privilege of stop-over in transit for creosoting treatment at the T. J. Moss Tie Company plant, is applied to the movement of all the ties in question under provisions of tariffs duly published by authority of the Interstate Commerce Commission.

The tax in question is a general property tax and not open to any charge of discrimination, nor is any made. No question is raised by the plaintiff with reference to the amount of tax imposed. The issue, therefore, is whether or not a local tax in any sum could be legally assessed against complainant's ties at the T. J. Moss Tie Company plant on April 1, 1929. The burden of proof is upon the plaintiff to establish the illegality of the tax and its right to injunctive process.

While the United States Supreme Court in Central R. R. Co. v. U. S., 257 U. S. 248, 42 S. Ct. 80, 82, 66 L. Ed. 217, cited by complainant, recognized, without passing on, the validity of creosoting in transit privileges, the following significant language is found in the opinion: "Creosoting-in-transit, like other transit privileges, rests upon the fiction that the incoming and the outgoing transportation services, which are in fact distinct, constitute a continuous shipment of the identical article from point of origin to final destination. The practice has its origin partly in local needs, partly in the competition of carriers for business. The practice is sometimes beneficial in its results; but it is open to grave abuses. To police it adequately is difficult and expensive. Unless adequately policed, it is an avenue to illegal rebates and seriously depletes the carriers' revenues. Railroad managers differ widely as to the policy of granting such privileges."

It is obvious that the practice is not only open to abuse in the respects pointed out by the Supreme Court, but to an even greater degree in the evasion of state taxation if the state cannot, under any circumstances, tax commodities found at rest within its borders under a stop-over privilege conferred by an interstate rate schedule or tariff,

regardless of what the actual facts may be with reference to the length and nature of the stop-over and the use made of it by the shipper. An examination of the authorities discloses, however, that the courts have never held the test of a state's power to tax an article of commerce at rest within the state to be whether an interstate or an intrastate rate tariff is being applied at a given time.

The ultimate test of a state's constitutional power to tax articles of commerce appears to be, and always to have been, whether the exercise of such power under given circumstances amounts to a regulation of interstate commerce. Clause 3, section 8, article 1, Constitution of the United States; Woodruff v. Parham, 8 Wall. 123, 19 L. Ed. 382; Brown v. Houston, 114 U. S. 622, 5 S. Ct. 1091, 29 L. Ed. 257; American Steel & Wire Co. v. Speed, 192 U. S. 500, 24 S. Ct. 365, 370, 48 L. Ed. 538; Swift & Co. v. U. S., 196 U. S. 376, 25 S. Ct. 276, 280, 49 L. Ed. 518. In the case last mentioned, which was not a tax case, Mr. Justice Holmes threw out a hint that the precise question in cases involving the right of states to tax is peculiar to that class of cases, when in the opinion he said: "But it may be that the question of taxation does not depend upon whether the article taxed may or may not be said to be in the course of commerce between the states, but depends upon whether the tax so far affects that commerce as to amount to a regulation of it." In the later case of Bacon v. Illinois, 227 U. S. 504, 33 S. Ct. 299, 302, 57 L. Ed. 615, sustaining the power of a state to tax a commodity temporarily withdrawn from the carrier in transit under a stop-over privilege, the court said: "We come then to the question whether the grain, here involved, was moving in interstate commerce so that the imposition of the local tax·may be said to be repugnant to the Federal power." Again, in the same opinion: "The question, it should be observed, is not with respect to the extent of the power of Congress to regulate interstate commerce, but whether a particular exercise of state power in view of its nature and operation must be deemed to be in conflict with this paramount authority."

No decision is in conflict with the proposition that a state is without power to tax an article when it is actually in transit in interstate commerce. Bacon v. Illinois, supra.

The rule was established in Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715, that products being prepared and assembled for interstate shipment remain liable to local taxation until actually started in course of their interstate journey, or until delivered to a common carrier for that purpose. Likewise, it has long been held that, as soon as goods shipped in interstate commerce have reached their final destination, they there become liable to local taxation, though intended for sale, for further shipment in interstate or foreign commerce, Brown v. Houston, 114 U. S. 622, 5 S. Ct. 1091, 29 L. Ed. 257; and though they still be in the original unbroken packages in which shipped, Woodruff v. Parham, supra.

Whether goods, the movement of which in interstate commerce has been interrupted at a point between the point of origin and final destination, become subject to local taxation at the point of interruption must be determined from the various circumstances attending the interruption. Hughes Bros. Co. v. Minnesota, 272 U. S. 470, 47 S. Ct. 170, 71 L. Ed. 359. In Carson Petroleum Co. v. Vial, 279 U. S. 95, 49 S. Ct. 292, 293, 73 L. Ed. 626, the court said: "The crucial question to be settled in determining whether personal property or merchandise moving in interstate commerce is subject to local taxation is that of its continuity of transit." The difficulty lies in determining when the "continuity of transit" is broken. Temporary cessation of the actual forward movement does not break such continuity if reasonable, in good faith, and solely in furtherance of the intended transportation. Coe v. Errol, supra; Kelley v. Rhoads, 188 U. S. 1, 23 S. Ct. 259, 47 L. Ed. 359; Champlain Realty Co. v. Brattleboro, 260 U. S. 366, 43 S. Ct. 146, 67 L. Ed. 309, 25 A. L. R. 1195; Hughes Bros. Co. v. Minnesota, supra; Carson Petroleum Co. v. Vial, supra.

It is well established that the question as to whether the continuity in transit of a movement in interstate or foreign commerce is broken by an interruption at an intermediate point is not controlled by the character or method of the billing of the shipment nor by the fact that the exact ultimate destination in another state or country may or may not be known at the time of shipment. Carson Petroleum Co. v. Vial, supra; Texas & New Orleans R. R. Co. v. Sabine Tram Co., 227 U. S. 111, 33 S. Ct. 229, 57 L. Ed. 442. Nor does the mere fact that the goods may be under the control of the owner at the point of interruption with power in the owner there to withdraw or divert the goods from the interstate or foreign movement take

the goods out of interstate or foreign commerce, though this circumstance makes the problem more difficult of solution, as observed in the Brattleboro Case, supra. If the shipment has been made in good faith to a destination beyond the point of interruption, and the interruption is not indefinite, but is reasonable and solely in furtherance of the intended transportation of the shipment to its ultimate destination, then the continuity of the journey is not broken by the delay nor by the mere power of the owner there to destroy its character as interstate or foreign commerce. Champlain Realty Co. v. Brattleboro, supra; Hughes Bros. Co. v. Minnesota, supra; Carson Petroleum Co. v. Vial, supra.

In Coe v. Errol, supra, the United States Supreme Court approved the ruling of the Supreme Court of New Hampshire that logs which had started their interstate journey floating down the Androscoggin river and which were detained for a season in New Hampshire by low water were not subject to taxation in New Hampshire at the point of detention since the interstate movement had begun, and the delay was entirely due and incidental to the means of transportation.

In Kelley v. Rhoads, supra, sheep driven five hundred miles from Utah to Nebraska for further shipment there by rail, traveling nine miles per day and grazing for sustenance as they traveled, were held to be moving in interstate commerce and immune from local taxation enroute through the state of Wyoming under a state statute imposing a tax on all live stock brought into the state for the purpose of being grazed, the court finding that the sheep were not brought into Wyoming for the purpose of being grazed, but that such grazing as they did was necessary for their sustenance and incidental to their continuous interstate journey through Wyoming.

In Champlain Realty Co. v. Brattleboro, supra, it was held that logs being floated down the West river in Vermont on a continuous movement on the waters of the West and Connecticut rivers to Hinsdale, N. H., were not taxable at Brattleboro, Vt., an intermediate point, though detained for a considerable time by a boom at Brattleboro to await subsidence of high water in the Connecticut river, since the interruption was only to promote the safety of the drive.

In Hughes Bros. Co. v. Minnesota, supra, it was held that logs which the Hughes Bros. Timber Company of Minnesota were under contract with the Central Paper Company of Muskegon, Mich., to deliver at the mouth of the Pigeon river on Lake Superior for transportation, thence by vessels of the paper company to Muskegon, Mich., started their interstate journey when the drive of the logs began on the waters of the Swamp river where they had been assembled on the ice during the preceding winter, preparatory to floating down the Swamp river to the Pigeon river and thence to its mouth when the ice broke up; that the delay at the booms at the mouth of the Pigeon river for loading into the lake vessels of the paper company and the change in the means of transportation from floating to carriage on vessels did not break the continuity of the interstate journey and the logs were not taxable in Minnesota after the drive began on Swamp river.

In Carson Petroleum v. Vial, supra, it was held that oil purchased at interior points for export to fill contracts previously made did not lose its character as foreign commerce and become subject to state taxation, because, after arrival at the port, it was temporarily stored there for reasons of expedition and economy preparatory to its being loaded on the vessels of foreign consignees, it appearing that the delay was incidental to and in aid of the transshipment in foreign commerce, and therefore did not break the continuity in transit of the commodity.

In each of the foregoing cases in which it was held that the intermediate interruption of and the consequent delay in the interstate journey did not break its continuity, it will be observed that the interruption had solely to do with the transportation and was incidental to, in furtherance of, or operated to expedite or to promote the safety of, the transportation.

Let us now advert to some of the cases in which the passage of commodities from point of origin to final destination in another state was interrupted under circumstances held by the courts to have broken their continuity in transit so as to subject them to local taxation at the point of interruption.

In Pittsburgh & Southern Coal Co. v. Bates, 156 U. S. 577, 15 S. Ct. 415, 39 L. Ed. 538, coal shipped by the owners in their own barges from Pittsburg, Pa., consigned to their agent at New Orleans, La., was held taxable in the barges nine miles above Baton Rouge, La., where the barges were moored as a matter of convenience pending sale

there or the receipt of orders from the said agent in New Orleans for further movement.

In Diamond Match Co. v. Ontonagon, 188 U. S. 82, 23 S. Ct. 266, 47 L. Ed. 349, logs floated by owner down the Ontonagon river and its tributaries to booms at its mouth at the village of Ontonagon, Mich., there to be loaded on cars for transportation by railway to the owner's mills at Green Bay, Wis., were held to be liable to taxation at Ontonagon, in view of the evidence that this place was used by the owner as a sorting grounds and to hold the logs until such times as they were needed to keep the mills supplied to capacity at Green Bay. While it was pointed out in the opinion that neither the method of transportation nor the change of the means of transportation enroute from floating to carriage by rail affected the character of the commerce, it was held that, because the interruption at the point of change within the state of the origin of the logs was used for purposes other than the furtherance of the transportation to the final destination at Green Bay, the continuity in transit was thereby broken, and the actual interstate journey did not begin until the logs were shipped from Ontonagon.

In American Steel & Wire Co. v. Speed, supra, goods shipped by owner in original packages from points north of the Ohio river to the Patterson Transfer Company, Memphis, Tenn., for temporary storage, assortment, and reshipment in the original packages, in accordance with directions from the owner, to fill sales orders to jobbers and wholesalers, 90 per cent. of which went outside of the state of Tennessee, and which sales orders, reserving to the customers certain limited privileges of choice of quality and time delivery of the goods ordered, had usually been taken in advance of the production of the goods at the factories, were held to be taxable while in the hands of the said storage company at Memphis. The court, after reviewing the facts, said: "With these facts in hand we are of opinion that the court below was right in deciding that the goods were not in transit, but, on the contrary, had reached their destination at Memphis, and were there held in store at the risk of the steel company, to be sold and delivered as contracts for that purpose were completely consummated." The court recognized that the goods in the hands of the storage company in the original packages may not have entirely lost their character as subjects of interstate commerce, but held, nevertheless, under the doctrine laid down in Woodruff v. Parham, supra, and Brown v.

Houston, supra, that they were taxable in view of the circumstances shown by the evidence.

In General Oil Co. v. Crain, 209 U. S. 211, 28 S. Ct. 475, 52 L. Ed. 754, oil shipped by owner from Pennsylvania and placed in storage tanks at Memphis, Tenn., for distribution and reshipment in smaller quantities to previously ascertained customers in other states, was held taxable in Tennessee as having been taken from transportation and brought to rest within the state of Tennessee, for the convenience and advantage of the owner in filling separately small orders for delivery beyond Memphis, and while so at rest enjoying the protection of the state.

In Bacon v. Illinois, supra, grain which the owner had bought in the South and was shipping in interstate commerce under an arrangement between the owner and the railroad companies transporting the grain by which the owner was permitted to remove the grain from the custody of the carriers to his private grain elevator in Illinois for inspection, weighing, cleaning, clipping, drying, sacking, and grading with the power, under his contract with the carriers, either to change its ownership, consignee, or destination, or to restore the grain, after the processes mentioned, to the carriers to be delivered at the destination in another state according to his original intention, was held to be taxable at the owner's elevator in Illinois for the reason that the grain was there locally dealt with in the interest of the owner while it was in his custody and subject to his complete disposition for a collateral purpose of his own.

In Susquehanna Coal Co. v. South Amboy, 228 U. S. 665, 33 S. Ct. 712, 714, 57 L. Ed. 1015, coal shipped from Pennsylvania to South Amboy, N. J., and intended for further shipment to destinations in other states or countries, but not definitely determined, and stored while awaiting orders or means for transportation of orders already received, was held subject to taxation by the municipality within whose jurisdiction it was stored because the interruption was not a mere incident of or in furtherance of the transportation, but also served other beneficial purposes of the owner. The court said: "* * * There was something more than the submission to delay in transportation and the acceptance of its consequences. The situation was made a facility of business,—a business conducted through agents and employees. And, it will be observed, there was valuable property kept in the state, represented by the coal, varying in quantity from

10,000 tons to 150,000 tons. There was something more, therefore, than an incidental interruption of the continuity of its journey through the state." The court, after alluding to the facts shown by the evidence that part of the coal was accumulated at South Amboy to fill anticipated orders, further said: "The coal, therefore, was not in actual movement through the state; it was at rest in the state, and was to be handled and distributed from there. Therefore, the principles expressed in General Oil Co. v. Crain, 209 U. S. 211, 28 S. Ct. 475, 52 L. Ed. 754, and Bacon v. Illinois, supra, are applicable to it. The products in neither of those cases were destined for sale in the states where stored; the delay there was to be temporary, —a postponement of their transportation to their destinations. There was, however, a business purpose and advantage in the delay which was availed of, and while it was availed of, the products secured the protection of the state. In both cases it was held that there was a cessation of interstate commerce and subjection to the dominion of the state." Again, after discussing the difficulty of marking the line of dominion between national and state jurisdiction, the court said: "The one is as necessary as the other to be preserved."

In the group of cases in which the right of the state to tax was sustained, it will be observed that the controlling principle is precisely the same as that recognized in the cases in which the right of taxation was denied; that is, that any interruption of the movement of commodities at an intermediate point between origin and final destination that is not incidental to the transportation or the use of the means of transportation, or, being so incidental, is used or extended for purposes of the owner not incidental to the transportation or the means used therefor, breaks the continuity in transit and subjects the shipment to local taxation at the point of interruption. Under such circumstances a shipment is looked upon as being withdrawn from interstate commerce to an extent that its taxation by local authorities does not amount to a regulation or direct burdening of interstate commerce.

■ A review of the evidence in the case before the court convinces me that, while the primary purpose of the withdrawal of the ties from transportation at the T. J. Moss Tie Company plant was to procure their treatment with creosote under a privilege provided by the tariff schedules of doing so without losing the benefit of the lower through rate, the plaintiff extended and made use of the stopover for business purposes, advantageous to itself, that were neither incidental to the transportation nor to a procurement of the treatment of the ties which was the sole privilege under the rate schedule.

The testimony of the plaintiff's witnesses conclusively shows that the plaintiff, in practice, extended the interruption of the transportation of the ties at the T. J. Moss Tie Company plant beyond the time reasonably necessary to have the ties treated with creosote; that the extension was for purposes not incidental to the treatment of the ties and was made use of by the plaintiff as a business facility and convenience as follows: First, for sorting the seasoned ties from the unseasoned ties and otherwise using the grounds of the tie plant as a point for assembling and sorting the ties; second, for stacking the unseasoned ties in the yards for such periods before creosoting as was necessary for nature to put them into a completely seasoned condition ready for treatment; third, for storage of the ties in the yards of the plant until needed to meet the maintenance and construction requirements of the plaintiff as indicated by the monthly set-ups for shipment furnished by the plaintiff to its supervisor at the plant. In view of the evidence that the actual treatment required but a few hours, the conclusion is inescapable that, after making due allowance for any reasonable delay caused by the exposure of the ties to inclement weather and the routine handling of the ties through the plant, it was necessary to interrupt the transportation for a comparatively short period instead of an average of from three to four months.

These conclusions clearly bring the case within the principles laid down in the decisions of the United States Supreme Court in Bacon v. Illinois, supra; Diamond Match Co. v. Ontonagon, supra; Susquehanna Coal Co. v. South Amboy, supra, and other cases hereinbefore discussed wherein the power of the state to tax was sustained. They show that the continuity in transit of the ties was broken at the creosoting plant within the meaning of the test laid down in Carson Petroleum Co. v. Vial, supra, wherein the court pointed out with meticulous care that the delay there was in all respects incidental to the necessary transshipment of the oil in foreign commerce which began at its point of origin. The evidence fails to sustain the essential averment in the plaintiff's peti-

tion that the ties were delayed no longer at the plant of the T. J. Moss Company than was necessary for the purpose of creosoting them. Whether or not, if that averment had been sustained by the evidence, the result would be different is not necessary to determine.

Under the circumstances shown by the evidence, the conclusion must be, and is, that the ties in question were so far withdrawn from transportation in interstate commerce at the time they were assessed as complained of as to render them part of the general mass of property in the state of Illinois for taxation purposes; that the imposition of the tax in question did not amount to a regulation of or a direct burden upon interstate commerce, but was a proper exercise of the taxing power of the state of Illinois and its taxing bodies; and that the plaintiff's prayer for injunction should be denied and the bill dismissed for want of equity.