MELVIN, Acting Chief Judge.
Great Lakes Dredge & Dock Company has perfected its timely appeal from the final order of the Department of Revenue whereby the appellant was assessed the total sum of $186,083.91 in sales tax, use tax and interest.
It is the position of the Department of Revenue that the Great Lakes Dredge & Dock Company is responsible for the sales and use tax, as well as assessed interest, by reason of its participation in Florida in a joint venture contract entered into with two Dutch firms for the purpose of assisting in the expansion and modernization of the Port of Dammam, which is the main port of entry of Saudi Arabia. The joint venture is called GLABVO and its sole purpose is to perform as a dredging subcontractor on the Port of Dammam project. GLABVO has no business in the State of Florida or in any other state of the United States.
The general contract for the expansion and modernization of the Port of Dammam resulted because the existing port facilities were considered to be no longer adequate to handle the flow of trade, with unloading delays of as long as six to nine months being alleged. Accordingly, the Saudi Arabian Government placed a very high priority upon the completion of this project and, as a result of such priorities, imposed, by contract, severe penalties for delay on the part of the general contractor. Of course, these penalties in turn were to be passed along to the subcontractors, under the terms of the subcontract, to the extent that they caused the delay. For the Kingdom of Saudi Arabia and all parties involved in the contract, time was of the essence.
The joint venture agreement required of Great Lakes to make available certain equipment including derricks, fuel barges, dredges, tug boats and loading scows. All of this equipment was contracted to be provided in good working condition and, under the contract, Great Lakes was also obligated to provide GLABVO a full complement of materials and supplies needed for such harbor improvements. Great Lakes was paid by GLABVO a rental for the equipment and reimbursed for the purchase price of all the materials and supplies. The Department of Revenue asserts that it has the right, under the provisions of Chapter 212, Florida Statutes (1975), to assess use tax and sales tax on the materials and supplies thus purchased by Great Lakes in connection with its participation in the joint venture agreement for the Kingdom of Saudi Arabia. The supplies and materials, some of which were purchased in Florida and some of which were purchased in various other areas outside of Florida, were all mar-shalled at Dodge Island in Dade County, Florida, by Great Lakes in connection with its preparation to move the same overseas to the port location in the Kingdom of Saudi Arabia.
The Department does not dispute that all of the items purchased and upon which either a sales or use tax is sought to be imposed were purchased for the purpose of export when the same were ordered from the original vendor. The Department also does not dispute that all of the items were, in fact, exported to the Kingdom of Saudi Arabia, and that the same were consumed in the Kingdom of Saudi Arabia in obedience to the contract heretofore referred to but it contends that because all of these supplies and materials came to rest at Docfge Island and some were repackaged for loading on ocean-going barges, that the same then become subject to use tax and/or sales tax pursuant to Chapter 212, Florida Statutes (1975).
It is the contention of Great Lakes that the acquisition of these supplies and materials and the marshalling of the same at the point referred to, were exempted by virtue of Article I, Section 10, Clause 2 of the Constitution of the United States (The Import-Export Clause), and that since, from the very inception of each purchase, the *1080 items purchased were definitely committed into the channels of commerce for the irrevocable purpose of moving the same in interstate commerce to the Florida point from which, in international commerce; the same were moved to the Kingdom of Saudi Arabia. Such it is said brings about an exemption of the purchase and rentals of such agreements and such materials and supplies from the Florida sales and use tax. We agree and reverse the order appealed from.
The most .recent Florida Supreme Court decision considering the Import-Export Clause and Section 212.06(5) Florida Statutes (1975)[1] is Fred McGilvray, Inc. v. Askew, 340 So.2d 475 (1976). There McGil-vray contested a sales and use tax assessment levied against certain tangible personal property purchased both within and outside the state. All of the property assessed was eventually shipped to the Bahamas pursuant to McGilvray’s contract with a construction contractor there. The barge transporting the property to the Bahamas was not a common carrier and there were no bills of lading or export declarations properly before the court in connection with the shipment. Relying upon Kosydar v. National Cash Register Co., 417 U.S. 62, 94 S.Ct. 2108, 40 L.Ed.2d 660 (1974), and the cases cited therein, the trial court held that the property was not exempt from Chapter 212 taxes under the Import-Export Clause of the U.S. Constitution. Affirming the trial court, the Florida Supreme Court stated that:
“Section 212.06(5), Florida Statutes (1969), establishes a presumption that tangible personal property is not to be considered ‘as being imported, produced or manufactured for export unless the importer, producer or manufacturer delivers the same [i] to a licensed exporter for exporting, or [ii] to a common carrier for shipment outside the state or [iii] mails the same by United States mail to a destination outside the state.’ This presumption, of course, is rebuttable by the taxpayer. . . ” (Latter emphasis supplied)
Finding that the appellant had failed either to meet any .of the above three requirements or to rebut the statutory presumption, the Supreme Court affirmed the imposition of the taxes.[2]
Although the McGilvray case establishes that tangible personal property will be presumed to be not for export, unless one of the three stated criteria are met, the case does not stand for the proposition that the statutory presumption may be rebutted only by meeting one of the three stated criteria.[3] Rather, if one of the three erite- *1081 ria of Section 212.06(5), F.S. is met by the taxpayer, then there is no statutory presumption created that the property sought to be taxed is not within the stream of exportation. As such, the three criteria are indicators of certainty of exportation. Stated another way, the Florida Legislature has apparently determined that property entered into the stream of exportation by one of the means described by the three criteria is either irrevocably committed to exportation or that exportation is certain to such a high degree of probability that the presumption of no exportation need not arise. If, on the other hand, the taxpayer does not avail himself of one of the three methods described in Section 212.06(5) because of the necessity for greater speed in delivery, the size of the property to be shipped, special handling considerations, business economies, business necessity or for any other legal reason, then the Section 212.06(5) presumption arises and the taxpayer must rebut it in order -to avoid the tax.
In rebutting the presumption that his property has not been dedicated to the stream of exportation the taxpayer is often confronted with the charge that his property cannot be so dedicated unless it has been placed with a common carrier, the governmental postal system or some other similar agency that provides “certainty” of exportation. The Department uses the argument here and though it has been discussed in many cases the argument has been rejected repeatedly. Carson Petroleum Co. v. Vial, 279 U.S. 95, 49 S.Ct. 292, 73 L.Ed. 626 (1929); Coe v. Errol, 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715; Spalding & Bros. v. Edwards, 262 U.S. 66, 43 S.Ct. 485, 67 L.Ed. 865 (1923); Richfield Oil Corp. v. State Board of Equalization, 329 U.S. 69, 67 S.Ct. 156, 91 L.Ed. 80 (1946); Sunair Electronics v. Green, 177 So.2d 490 (Fla. 1st DCA 1965).
In Sunair Electronics v. Green, supra, one of the issues involved a Chapter 212 assessment on uninstalled radios which were being transported to their foreign purchasers in private aircraft being ferried to the same locations. Rejecting the necessity of the common carrier and approving the taxpayer’s practical transportation solution, this Court stated:
“. . .it appears . . that the shipment of the electronic equipment by appellant manufacturer to the foreign purchaser in the latter’s personally owned aircraft rather than by way of common carrier was not determinative of the tax-ability of the transaction. Placing the equipment in the purchaser’s aircraft for transportation to its foreign destination just as certainly committed the property sold to the export stream as did the pumping of the oil by Richfield into'the hold of the New Zealand tanker.”
Abating the tax imposed, this Court cited with approval the case of Gough Industries Inc. v. State Board of Equalization, 51 Cal.2d 746, 336 P.2d 161 (1959), and the four controlling factors the Supreme Court of California found present in a sale of electrical products to an Arabian corporation, which exempted the transaction from the state sales tax under the Import-Export Clause. The factors, which we find present in the instant case are:
“. . (a) the agreement of sale contemplated shipment of the goods in export, that is, from a seller in the United States to a buyer in a foreign country; (b) from the beginning of the transaction, the goods were committed to go all the way to the foreign country; (c) the movement of the goods had actually started when the tax was sought .to be imposed; and (d) the journey was continuous and unbroken by any action or delay taken for a purpose independent of the transportation of the goods.”
*1082 The Richfield decision, supra, involved a situation in which Richfield pumped oil from its refinery to the harbor of Los Ange-les, where it was placed in storage tanks and pumped, in that case, to a New Zealand tanker for exportation. The California Supreme Court upheld the assessed state sales tax on the theory that the delivery of oil which resulted in the passage of title occurred prior to the commencement of the exportation. It was suggested by that court and conceded by the state that a different result would have obtained had the oil been delivered to a common carrier.
The Supreme Court of the United States reversed and invalidated the tax stating in part:
“The certainty that the goods are headed to sea and that the process of exportation has started may normally be best evidenced by the fact that they have been delivered to a common carrier for that purpose. But the same degree of certainty may exist though no common carrier is involved.

It would not be clearer that the oil had started upon its export journey had it been delivered to a common carrier at an inland point. The means of shipment are unimportant so long as the certainty of the foreign destination is plain.” (Emphasis supplied)
As construed by this Court in Sunair and the Florida Supreme Court in McGilvray, the Legislature, through Section 212.-06(5)(a), has not sought to hamstring the business interests of this state, when they seek to engage in international commerce, by dictating the means of transportation they must employ in transporting their goods. Rather, they have merely lessened the exporters’ burden of proof if they utilize one of the “high degree of certainty” methods of transportation described in the statute. Should the exporter select a different mode of transportation, as did the appellant in the instant case, then the burden of proof becomes greater. It is not an impossible burden; it merely raises 'the question “. . . whether a sufficient commencement of the process of exportation has occurred so as to immunize the article at issue from state taxation.” Kosydar v. National Cash Register Co., supra.
The Department relies heavily upon the National Cash Register decision but its reliance is misplaced, for there, the machines sought to be taxed, although manufactured pursuant to a foreign purchase order and admittedly designed for foreign use, had never entered the stream of exportation. Rather, after being manufactured in N.C. R.’s main production plant located in Dayton, Ohio, the machines were stored in a N.C.R. warehouse also located in Dayton, while awaiting shipment. Indeed, the court noted that some of the machines had remained stored in the warehouse awaiting shipment for as long as three years.
Relying heavily upon the fact that the NCR machines were still located in a NCR warehouse on the tax day, that title and possession were still in NCR, that no payment had been made by the foreign purchasers and that the machines were then in the complete control of NCR, the court upheld the taxation imposed stating:
“More important, there had simply been no movement of the goods — no shipment, and no commencement of the process of exportation. Given this factual setting, it would require a sharp departure from nearly a century of precedents under the Import-Export Clause for us to conclude that the machines were ‘exports’ and exempt from state taxation.
“. . . ‘such goods do not cease to be part of the general mass of property in the state, subject, as such, .to its jurisdiction, and to taxation in the usual way, until they have been shipped, or entered with a common carrier for transportation, to another State, or have been started upon such transportation in a continuous route or journey’.”
In 1929, the U.S. Supreme Court heard the case of Carson Petroleum Co. v. Vial, 279 U.S. 95, 49 S.Ct. 292, 73 L.Ed. 626, which questioned the “continuity of transit” of certain quantities of oil moved in interstate and international commerce. Specifi *1083 cally, the oil was purchased by Carson Petroleum in the Mid-Continent Field and transported by rail to its tank farm near New Orleans. The oil was stored in large tanks and was often allowed to accumulate in order to avoid expensive demurrage charges on the ships it was to be loaded for export. The Louisiana authorities claimed-that the oil, stored in the tank farm was subject to local taxation, even though intended and prepared for exportation, because it had come to rest in the state between its rail trip to the port and its subsequent marine shipment to Europe. The oil company, on the other hand, contended that the shipment of the oil from refinery to foreign purchaser was continuous notwithstanding the storage and stoppage at port where it had to await either the arrival of a ship or the accumulation of a sufficient quantity of oil to load a ship.
Citing to its earlier decision in Coe v. Errol, supra, among others, the court stated:
“ ‘The conclusion in cases like this must be determined from the various circumstances. Mere intention by the owner ultimately to send the logs out of the state does not put them in interstate commerce, nor does preparatory gathering, for that purpose, at a depot. It must appear that the movement for another state has actually begun and is going on. Solution is easy when the shipment has been delivered to a carrier for a destination in another state. It is much more difficult when the owner retains complete control of the transportation and can change his mind and divert the delivery from the intended interstate destination, as in the Champlain Company [Champlain Realty Co. v. Brattleboro, 260 U.S. 366, 43 S.Ct. 146, 67 L.Ed. 309] case. The character of the shipment in such a case depends upon all the evidential circumstances looking to what the owner has done in the preparation for the journey and carrying it out. The mere power of the owner to divert the. shipment already started does not take it out of interstate commerce, if the other facts show that the journey has already begun in good faith and temporary interruption of the passage is reasonable and in furtherance of the intended transportation, as in the Champlain case. Here the case is even stronger in that the owner and initiator of the journey could not by his contract divert the logs after they had started from Swamp River without a breach of contract made by him with his vendee, who, by the agreement of sale, divided with him the responsibility for the continuous interstate transportation.’ ” (Emphasis supplied)
Noting that “[t]here has been a liberal construction of what is continuity of the journey, in cases where the court finds from the circumstances that export trade has been actually intended and carried through,” the Carson court discussed its decision in the case of Texas & New Orleans R. Co. v. Sabine Tram. Co., 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442 (1913), which involved the shipment of lumber destined for export. There the exporter purchased lumber from various mills in Texas and had it transported to port, where it was stored until the exporter selected it for shipment to a select foreign destination. Despite the fact that the lumber was stored at dockside, the Sabine Tram, court held that the shipments were in interstate and foreign commerce, stating:
“The determining circumstance is that the shipment of the lumber to Sabine was but a step in its transportation to its real and ultimate destination in foreign countries. In other words, the essential character of the commerce, not its mere accidents, should determine. It was to supply the demand of foreign countries that the lumber was purchased, manufactured and shipped, and' to give it a various character by the steps in its transportation would be extremely artificial. Once admit the principle, and means will be afforded of evading the national control of foreign commerce from points in the interior of a state. There must be transshipment at the seaboard, and if that may be made the point of ultimate destination by the device of separate bills of lading *1084 the commerce will be given local character, though it be essentially foreign.”
Thus, absent delivery to a common carrier, or the like,, the issue in the Import-Export Clause cases appears to be whether the property has been started upon its foreign transportation in a continuous route or-journey with a high degree of certainty that it is headed for its foreign destination and will not be diverted to domestic use. Such determinations have invariably turned on the facts of each case and so it is in this case that the facts supply the high assurance of exportation necessary to defeat the tax.
The joint venture in this case was entered into December 16, 1975. As the majority venture holder, Great Lakes, was contractually obligated to furnish, for rental, the majority of the dredging equipment and its associated supplies and materials. Time being of the essence and there being no local Saudi suppliers of repair parts and materials, a major concern was the acquisition of sufficient on-hand repair parts and materials to avoid breakdowns and costly work stoppages. The record reveals that on December 30, 1975, Great Lakes began ordering pipes, valves, welding supplies and equipment and a hydraulic crane, among other things. The purchase orders required delivery to Dodge Island, Miami, stated that the property was to be marked “for export”, and in most cases required the property to be marked at a minimum with “Dammam” as the destination and with Great Lakes’ tax identification number. Most purchase orders requested delivery by the end of January 1976.
On January 22, 1976, GLABVO entered into a Transportation Agreement with Global Transport requiring Global to provide three ocean-going tows to Dammam, two of which were to originate at Dodge Island where the first tow whs to be tendered on February 15, 1976. Demurrage charges for the tug and tow were to be $7,500 per day. At the administrative hearing on this matter Great Lakes’ witnesses testified that utilizing Global Transport’s services was the superior method of transportation in terms of time, expense and safety. Considering the scarcity of existing harbor facilities at Dammam, utilizing Global’s ocean-going tow, with its float-on, float-off capability was the only practical method of transport available.
The Global tow became available to Great Lakes at Dodge Island on or about February 11, 1976, and the loading process began immediately. Loading involved, first, sinking the 100 by 400 foot Global barge and then floating the cargo aboard. The largest single piece of cargo on the first tow was a hydraulic dredge which weighed about 2200 tons. Positioning of the cargo to achieve the proper balance was critical. The hydraulic dredge, a smaller tug and several barges of various types were floated on the large tow and positioned. The tow was then refloated and the cargo secured for its ocean journey. The supplies and materials taxed were containerized for protection and placed on the smaller barges to facilitate their off-loading at Dammam. Inventory was kept during the loading process and bills of lading and export declarations were prepared during the final loading. The process was continuous until the ocean-going tug and tow departed for Dam-mam on February 18, 1976. Following its 50 to 60 day journey to Dammam, the same Global tug and tow returned to Dodge Island, was loaded again and departed for Dammam on May 24, 1976. As stated, all of the assessed tangible personal property was exported to Saudi Arabia.
From the foregoing, we are convinced that the property assessed was dedicated to a continuous and certain process of exportation from the time it was shipped from the various vendors within and outside the state. The property was ordered pursuant to a foreign contract on purchase orders stating that the goods were for exportation and were to be so marked. The limited delays or interruptions involved in moving the property from vendor to Saudi Arabia were merely necessary steps in the exportation process and did not result in the goods settling into the mass of property of the state. As stated by the United States Su *1085 preme Court in Spalding & Bros. v. Edwards, supra:
“The fact that further acts were to be-done before the goods would get to sea does not matter so long as they were only the regular steps to the contemplated re-suit. Getting the bill of lading stands no differently from putting the goods on board ship. . . . ”
Any possibility that Great Lakes would divert the goods to the domestic market were remote and did not occur. As such, they are theoretical and may be left out of account, Spalding & Bros. v. Edwards, supra; Sunair Electronics v. Green, supra.
Great Lakes has successfully rebutted the Section 212.06(5)(c) presumption that the property assessed was not for export. The narrow statutory construction- urged by the Department would unduly strap the ports of Florida and our native industry in the competition for international commerce. We find no such intent on the part of the Legislature. Accordingly, the immunities afforded by the Import-Export Clause of the Constitution of the United States apply and the state sales and use taxes assessed must be-abated.
The final order appealed from is REVERSED.
BOOTH and LARRY G. SMITH, JJ., concur.

. Section 212.06(5)(a), F.S. (1975) states in pertinent part:
“(5)(a) It is not the intention of this chapter to levy a tax upon tangible personal property imported, produced or manufactured in this state for export, provided that tangible personal property shall not be considered as being imported, produced or manufactured for export unless the importer, producer or manufacturer delivers the same to a licensed exporter for exporting, or to a common carrier for shipment outside the state or mails the same by United States mail to a destination outside the state; . . .” (Emphasis supplied)

. For a critical examination of the McGilvray case, see Brill & Hayes, State and Local Taxation, 1976 Developments in Florida Law, 31 U.Miami L.Rev. 1231, 1267-72.

. Notwithstanding the apparent decision of our sister court to the contrary in Graybar Elec. v. State Dept. of Revenue, 347 So.2d 718 (Fla. 3d DCA 1977), cert. den. 358 So.2d 134 (Fla.1978), it is clear to us from our reading of the McGil-vray case and the United States Supreme Court’s decisions on the subject that the taxpayer is neither restricted to the three means of export delivery stated in Section 212.06(5), F.S. in order to enjoy the tax immunities provided by the Import-Export Clause nor is he limited to the use of those same three methods in rebutting the Section 212.06(5)(a) presumption that the transaction is not for export and, therefore, taxable. Discussing the McGilvray decision, the Third District in Graybar Elec. stated:
“The Florida Supreme Court in McGilvray . has interpreted this statute to create a presumption that tangible personal property cannot be considered export goods exempt from the state sales tax unless one of three conditions obtain: (1) the property is delivered to a licensed exporter for exporting, or (2) the property is delivered to a common carrier for shipment out of state, or (3) the property is mailed by the United States mails outside the state. The presumption created *1081 is rebuttable by the taxpayer upon a showing of any one of the above three conditions, in which case the property would not be subject to the state sales tax.”
However, it seems apparent to us that had the taxpayer utilized any of the statutory methods of transportation initially, their tangible personal property would be considered “for export” and there would be no adverse presumption for the taxpayer to rebut.