SUSQUEHANNA COAL COMPANY *v.* MAYOR AND COUNCIL OF THE CITY OF SOUTH AMBOY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEW JERSEY.

No. 301. Argued May 6, 7, 1913.—Decided May 26, 1913.

Where the trade in an article can only be accommodated by storage at some point in transit from the point of shipment in one State to final destination in another, and there is a business purpose and advantage in the delay during which the article secures the protection of the State where it is stored, there is a cessation of interstate commerce and the article is subject to the dominion of, and taxation by, the State. *Bacon* v. *Illinois,* 227 U. S. 504.

Coal shipped from Pennsylvania to South Amboy, New Jersey, and intended for further shipment to ports in other States or countries, but not definitely determined, and stored while awaiting orders or means of transportation for orders already received, *held* that there was in this case more than mere incidental interruption and the coal was subject to taxation by the municipality within whose jurisdiction it was stored.

*Quære,* whether in New Jersey a decision as to the legality of a tax for one year is *res judicata* as to same grounds in regard to a tax for a later year on the same property.

THE facts, which involve the right of the State to tax coal brought from another State while it is awaiting shipment to ports in other States and countries, are stated in the opinion.

*Mr. Alan H. Strong,* with whom *Mr. James B. Vredenburgh* was on the brief, for appellant.

*Mr. Frederic M. P. Pearse* for appellees.

MR. JUSTICE MCKENNA delivered the opinion of the court.

Bill in equity to restrain the collection of taxes levied by the City of South Amboy upon coal belonging to plain-

tiff in error on the ground that the coal was in transit from
points in the State of Pennsylvania through the State of
New Jersey to destinations outside of the latter State and
being, as it is alleged, in interstate commerce, the taxes
on it were illegally levied because in contravention of the
commerce clause of the Constitution of the United States.

Plaintiff in error is a Pennsylvania corporation and a
dealer in coal, buying three-fifths of what it sold in the
years 1906, 1907 and 1908 and producing two-fifths itself.
Plaintiff in error shipped its coal from its mines in Pennsyl-
vania to New York and the States east thereof by the
Pennsylvania Railroad across New Jersey, to leave the
latter State at Harsimus Cove, Greenville or South Amboy
piers, the termini of the road on New York harbor. In
the year 1906 it shipped 1,582,000 tons of coal; in 1907 it
shipped 2,010,200 tons, and in 1908 it shipped 2,050,500.
Of these amounts, $3\frac{1}{2}\%$, $4\frac{1}{2}\%$ and $6\%$, respectively,
were unloaded at South Amboy. The balance of the
amounts shipped passed through Harsimus Cove and
Greenville piers. The cars, on arrival at the latter points,
were floated across the harbor and transferred to railroads
on the opposite side. The bills of lading for the coal thus
shipped were made out to designated purchasers as con-
signees; the coal which arrived at South Amboy was con-
signed to plaintiff in error at such place and was intended
to be transferred to bottoms at tidewater and shipped to
States east of New Jersey. "This coal," we quote from
the opinion of the District Court, "was forwarded from
the mines on orders from the complainant's Philadelphia
agents who issued such orders upon requisitions made
upon them from complainants' New York agents. Neither
the agents at the mines nor at Philadelphia knew for
which particular customers the coal thus forwarded to
South Amboy, was intended. Complainant had a number
of regular customers east of New Jersey, to whom it
promised to make deliveries on monthly contracts; the

exact requirements of such customers, in tonnage and kind of coal, were known only to the New York agents. These agents from time to time totaled such requirements plus other orders for coal, and issued their requisition based upon such totals, to the Philadelphia agents. Such requirements and the shipments made thereunder, varied in tonnage and kind of coal. At South Amboy complainant had an agent who, upon the orders of the New York agents, superintended the loading upon such bottoms of the kind and amount of coal required for designated customers. When so loaded, the master of the bottoms issued bills of lading in the name of the complainant as shipper, and particular persons as consignees. These bills of lading were sent to complainant's New York agents, whereupon the latter made out invoices to the consignees. Up to the time of loading the bottoms, the title of the coal was in complainant.

"If, upon arrival of the coal at South Amboy, bottoms were on hand to take the kind of coal arriving, such coal was transferred from the cars to the bottoms. If not, such coal was dumped into a coal depot or storage yard of the railroad company, located about two thousand feet from the piers, equipped with derricks for the loading and unloading of coal, and where the different kinds of coal of the complainant were put into piles, which would be subsequently transferred into bottoms; not necessarily the first bottoms arriving as the preference was given to coal subsequently arriving and still in cars. In the year 1906 the expense of dumping the coal from the cars and its subsequent transfer into bottoms was borne by the railroad company. Subsequently, such expense was borne by complainant."

It appears from the testimony that the amount of coal in the depot or storage yard at South Amboy varied. "It went," it was testified, "to 10,000 tons, but it ranges from 20,000 up to 150,000 tons."

The conclusion of the District Court was that by the storage of coal, plaintiff in error "obtained two beneficial results. First, cars arriving when no bottoms were on hand could be released and demurrage charges saved; second, when bottoms arrived and no cars were on hand containing the kinds of coal desired, such vessels could be loaded from the piles, resulting in a saving of time in the departure of such bottoms." In other words there was something more than the submission to delay in transportation and the acceptance of its consequences. The situation was made a facility of business, a business conducted through agents and employés. And, it will be observed, there was valuable property kept in the State represented by the coal, varying in quantity from 10,000 tons to 150,000 tons. There was something more, therefore, than an incidental interruption of the continuity of its journey through the State.

The principal witness in the case for plaintiff in error, assenting to the testimony of its vice-president given before the State Board of Equalization, testified that without regard to any orders, even anticipating the market, the attempt was to keep a certain amount of coal on hand at South Amboy. This anticipation, the witnesses explained, was an anticipation of orders from regular customers in the near future, the witness saying that while there was no order for it, still there was an implied order; "that is, an implied order and a regular condition of trade, and to supply that trade we keep that coal there. . . . The condition was, to take care of the trade that was regular, and this coal was not kept there for that purpose, it was there from an overplus, or inability to load it in boats, and therefore was to fill these implied contracts and orders—they weren't orders, but were implied contracts." This is confusing, but it is manifest that the coal was used to fill anticipated orders, orders not immediately made but, it may be, certain to be made. It

does not appear how they could be filled, uncertain in time as they were, except from the accumulations at South Amboy. Indeed it is in the testimony that without such accumulations the orders might strike a period when there were no cars and no coal and then customers would suffer.

It is clear, we repeat, that such trade could only be accommodated through the storage of coal somewhere, and plaintiff in error availed itself of the conditions to put the storage in New Jersey.

The coal, therefore, was not in actual movement through the State; it was at rest in the State, and was to be handled and distributed from there. Therefore, the principles expressed in *General Oil Co.* v. *Crain,* 209 U. S. 211, and *Bacon* v. *Illinois,* 227 U. S. 504, are applicable to it. The products in neither of those cases were destined for sale in the States where stored; the delay there was to be temporary, a postponement of their transportation to their destinations. There was, however, a business purpose and advantage in the delay which was availed of, and while it was availed of, the products secured the protection of the State. In both cases it was held that there was a cessation of interstate commerce and subjection to the dominion of the State.

In *Bacon* v. *Illinois,* the grain which was taxed had been shipped by the original owners, who were residents of southern and western States, under contracts for its transportation to New York and Philadelphia and other eastern cities, with a reservation to the owners to remove it from the cars at Chicago for certain temporary purposes "or change the ownership, consignee or destination thereof." The grain, while in transit, was purchased by Bacon, he succeeding to the rights of the vendors. Upon arrival of the grain at Chicago he exercised the right to remove it from the cars to his private elevator to avail himself of the privilege reserved. The privilege being exercised, he turned the grain over to the railroad com-

panies for transportation in accordance with original contracts. After commenting upon the power he had over the grain while in Chicago, we said (p. 516), "He had established a local facility in Chicago for his own benefit and while, through its employment, the grain was there at rest, there was no reason why it should not be included with his other property within the State in an assessment for taxation which was made in the usual way without discrimination." For this conclusion cases were cited. It was further said (p. 517), "The property was held within the State for purposes deemed by the owner to be beneficial; . . ."

In *General Oil Co* v. *Crain*, oil contained in tanks at Memphis, Tennessee, was subject to an inspection tax. The oil was shipped to Memphis from producing and refining points in Ohio and Pennsylvania and handled in tank cars and other receptacles to be forwarded to customers in Arkansas, Louisiana and Mississippi, in which States the oil company had many regular customers from whom it always had on hand many unfilled orders for oil to be delivered as soon as possible or convenient. At Memphis the oil company maintained two tanks, one of which was plainly marked: "Oil already sold in Arkansas, Louisiana and Mississippi," and which remained in Memphis only long enough (a few days) to be properly distributed according to the orders therefor. The other tank or vessel was for oil sold in those States and kept separate and apart until orders should be received from customers in those States. The oil was never sold otherwise than upon such orders. We said of this situation that the company was doing business in the State and that its property was receiving the protection of the State. Its oil was not in movement through the State. To the contention that the oil was only there for distribution and to fulfill orders already received, we said (p. 231), "It required storage there—the maintenance of the means of

storage, of putting it in and taking it from storage."
In that case and in *Bacon* v. *Illinois* we considered the
cases relied on here by plaintiff in error in which particular
exercises of the state power were decided to be in conflict
with the paramount authority of Congress over interstate
commerce. We need not again review the cases. We are
not unmindful of their principle and reasoning and the
difficulty presented in them and presented here of mark-
ing the line of dominion between the National and state
jurisdiction. The one is as necessary as the other to be
preserved.

It is contended by defendant in error that the basis of
the taxes of all three years is the same and that the taxes
of 1906 were attacked by proceedings in the New Jersey
state courts, the same grounds of illegality being asserted
there as here (*Susquehanna Coal Co.* v. *South Amboy*, 76
N. J. L. 412; 77 *id.* 796), and that therefore the decision of
the state court is *res judicata*. The views we have ex-
pressed make it unnecessary to pass upon the contention
or to consider—the question not being raised—whether
the decision as to the taxes in 1906 is an adjudication also
under the laws of the State of the taxes of 1907 and 1908.
See *New Orleans* v. *Citizens Bank*, 167 U. S. 371; *Deposit
Bank* v. *Frankfort*, 191 U. S. 499, 573; *Citizens Bank* v.
*Parker*, 192 U. S. 73.

*Judgment affirmed.*