DIVISION OF TAX APPEALS.

IN THE MATTER OF THE APPEAL OF CITY OF JERSEY CITY, v. MARITIME PETROLEUM CORPORATION, FOR THE YEAR 1943.

Decided November 12, 1946.

For the petitioner, *Charles A. Rooney* (by *Arthur Mullen* and *Marcel E. Wagner*).

For the respondent, *Milton, McNulty & Augelli* (by *John Milton, Jr.*).

KREAMER, COMMISSIONER. The City of Jersey City levied a personal property assessment in the amount of $175,000 against products known as No. 2 fuel oil and kerosene owned by Maritime Petroleum Corp., a corporation of the State of New York, taxpayer herein. These products were located in tanks owned by Tankport Terminals, Inc., situate within the taxing district of the city. An appeal was taken by the taxpayer to the Hudson County Board of Taxation, which Board set aside and canceled the assessment. The city now appeals from the County Board judgment and seeks to have the assessment restored.

Maritime resists the appeal on two grounds:

(1) That such fuel as is to be found on the premises of Tankport is there only temporarily stored, being intended for transportation and disposal by and to customers of Maritime, so that no taxable *situs* in Jersey City attaches thereto as being in interstate commerce and within the protection of the commerce clause of the federal constitution, article 1, section 8, clause 3; and (2) that the fuel admittedly owned by Maritime was stored in tanks of the Tankport Terminals, Inc., a corporation of New Jersey, engaged in the business of

storage and warehousing petroleum products and by reason of such storage was thereby exempt from taxation under provisions of *R. S.* 54:4–3.20; *N. J. S. A.* 54:4–3.20: "all personal property stored in a warehouse of any person, co-partnership, or corporation engaged in the business of storing goods for hire shall be exempt from taxation."

Maritime Petroleum Corp. is in the business of buying and selling fuel oil and kerosene and its principal suppliers are the Standard Oil Company of New Jersey, and the Shell Oil Company. The location of the actual source of supply is referred to in the testimony as the "gulf." During the months of June, July and August of any year, Maritime lines up its customers and enters into contracts for the furnishing of its fuel products to them. These contracts are actually entered into at a time when Maritime has as yet not received title to any oil from its suppliers. The amount of fuel contracted to be sold by Maritime is the factor governing the quantity purchased by it. The suppliers then ship the product by tanker from the gulf to the storage point at Tankport where the same is pumped into the tanks leased by Maritime and title to the fuel is then transferred to Maritime. The tankers in which the fuel is shipped are not owned by Maritime, nor does that company maintain any employees where the fuel is stored. The evidence discloses that the fuel remains in storage for an indeterminate period, where it is mingled with other fuel owned by other companies. The fuel is not processed while it remains at Tankport.

The ultimate destination of the fuel is completely dependent upon the customers of Maritime. If the particular customer has inland storage, the product moves by truck, or if the customer has water storage, it is removed by barge. But in both cases the product is taken in facilities and equipment either owned or hired by the customers of Maritime.

We are driven to the conclusion that the subject products, after being unloaded and mingled with the products of others, and remaining at Tankport for an indeterminate period, depending upon the will of the customers of Maritime, cannot be considered as being in interstate commerce. The case at bar comes squarely within the purview of a very recent pro-

nouncement upon the subject by our Court of Errors and Appeals. · We refer to *Independent Warehouse* v. *Scheele,* 134 *N. J. L.* 133; 45 *Atl. Rep.* (2d) 703.

In that case the Erie Railroad, at the direction of its shippers, stored coal at storage warehouse facilities in New Jersey, maintained through a separate corporation wholly owned or controlled by Erie. The coal was mixed with the product of other companies and remained at the storage point known as "Coalberg" for an indefinite period subject to the will of the owner, who would decide when and where it was to be shipped. It was urged in support of the argument that the coal in storage was in interstate commerce, that the warehouse facilities were employed solely to provide regular intransit service to shippers for interstate shipment of coal. The court said:

"Thus the continuity of the carriage in interstate commerce is broken when the carried commodity is unloaded and stored at Coalberg for an indefinite period, subject to the owner's disposal, and thereby the coal becomes intermingled with the general mass of property having a *situs* within the state, and subject to the state's dominion and liable to taxation as such; and. the stored coal retains that character and status until it is again shipped in interstate commerce. It does not become the subject of carriage in interstate commerce by reason of its conveyance by rail from Coalberg to other points of New Jersey. * * *

"Property actually in transit in interstate commerce is exempt from local taxation. But if property be stored 'for an indefinite time during such transit, at least for other than natural causes or lack of facilities for immediate transportation, it may be lawfully assessed by the local authorities.' *Kelley* v. *Rhoads,* 188 *U. S.* 1; 23 *S. Ct.* 259, 261; 47 *L. Ed.* 359. * * *

"Actual transit is the determinant. Here, movement in interstate commerce had ceased when the storage for an indefinite period began, and the coal then came within the dominion and protection of the state. As in the case of *Susquehanna Coal Co.* v. *South Amboy,* 76 *N. J. L.* 412; 69 *Atl. Rep.* 454; affirmed, 77 *N. J. L.* 796; 72 *Atl. Rep.*

361, there was something more than an incidental interruption of the continuity of the transportation through the state. On a bill in equity to restrain the collection of taxes levied in that case, the federal Supreme Court expounded the principle that, even though the delay in interstate transportation was but temporary, if it was availed of for 'a business purpose and advantage,' the commodity during that particular period 'secured the protection of the state,' and it was therefore subject to local taxation. *Susquehanna Coal Co.* v. *City of South Amboy,* 228 *U. S.* 665; 33 *S. Ct.* 712, 714; 57 *L. Ed.* 1015.

"The case of *Lehigh and Wilkesbarre Coal Co.* v. *Borough of Junction,* 75 *N. J. L.* 68; 66 *Atl. Rep.* 923; affirmed, *Id.,* 75 *N. J. L.* 922; 68 *Atl. Rep.* 806; 15 *L. R. A.* (*N. S.*), 514, is to the same effect. It does not matter that there the goods were owned by the carrier. That does not serve to vary the application of the principle. The determinative question is whether there was a cessation of interstate commerce when the goods were placed in storage at Coalberg for an indefinite period of time; and it must be resolved in the affirmative. To borrow the language of Mr. Justice McKenna in the case of *General Oil Co.* v. *Crain,* 209 *U. S.* 211; 28 *S. Ct.* 475, 482; 52 *L. Ed.* 754, the coal 'required storage there—the maintenance of the means of storage; of putting it in and taking it from storage. See, also, *State, Detmold and Cox, Pros.,* v. *Engle,* 34 *N. J. L.* 425; *State, Lehigh & W. Coal Co., Pros.,* v. *Carrigan,* 39 *N. J. L.* 35.'

In a similar case the Supreme Court of Delaware in *State* v. *Crane Hook Oil Storage Co.,* 2 *Terry* 194; 18 *Atl. Rep.* (*2d*) 427, 429, said:

"The regulatory power of Congress does not attach until the transit begins, and conversely, the power ceases when the movement reaches the point where the parties originally intended that it should finally end. The crucial question to be settled in determining whether personal property moving in interstate commerce is subject to local taxation is that of its continuity of transit, *Carlson Petroleum Co.* v. *Vial,* 379 *U. S.* 95; 49 *S. Ct.* 292; 73 *L. Ed.* 626; and if property is detained for an indefinite time during transit, at least for

other than natural causes or lack of facilities for immediate transportation, it is not during that time the subject of interstate commerce but is subject to the operation of state laws. *Susquehanna Coal Co.* v. *South Amboy,* 228 *U. S.* 665; 33 *S. Ct.* 712; 57 *L. Ed.* 1015."

See, also, *Socony Vacuum Oil Co.* v. *Borough of Edgewater,* 23 *N. J. Mis. R.* 199; 42 *Atl. Rep.* (*2d*) 775.

As exemptions under the General Tax Act are allowed only upon compliance with the statute, the burden of proof that the statute has been complied with rests upon the party claiming the exemptions.

"No allowance * * * shall be made for personal property * * * claimed to be exempt from taxation, unless a sworn claim therefore shall be made * * *." *R. S.* 54:4–15; *N. J. S. A.* 54:4–15.

It was held in *Hardin* v. *Morgan,* 70 *N. J. L.* 484; 57 *Atl. Rep.* 155; *affirmed,* 71 *N. J. L.* 342; 61 *Atl. Rep.* 1118, that:

"The right to exemption is a matter of grace, which the statute confers upon a compliance with its requirements. It is essential, to secure the exemption, that it shall be applied for within the time and in the manner pointed out by the statute; otherwise the exemption is lost * * *. Exemption from taxation is a favor, and the statutes under which it is allowed must be strictly complied with. Compliance is a condition precedent to the right of exemption."

The respondent has failed to carry the burden of showing the filing of a sworn statement. In fact, the testimony reveals an admission by the respondent that such statement was not filed. Under these circumstances, no exemption can be allowed. *Frigidaire Corp.* v. *City of Newark* (*State Board,* filed February 23d, 1937); *Ballmill Lumber and Sales Corp.* v. *City of Newark* (*State Board,* filed May 29th, 1939); *Continental Purchasing Co., Inc.,* v. *City of Newark,* 18 *N. J. Mis. R.* 204; 12 *Atl. Rep.* (*2d*) 133.

Upon the question of valuation we are of the opinion that a valuation of $85,504.24 should be placed upon the personalty in accordance with the proof submitted by the taxpayer. As stated, this valuation was based upon an average

quantity of fuel belonging to the taxpayer over the twelve month period of operation. The figures were taken from the books of the company from month-end inventories.

Provision for valuation predicated upon an estimated average of the personalty assessed is contained in the statute (*R. S.* 54:4–11; *N. J. S. A.* 54:4–11), which reads:

"Personal property consisting of stocks in trade and materials used in manufacture in this state, which shall include raw materials, fuel, goods in process of manufacture and completed products, shall be estimated at the average of such personalty located in the taxing district during the year preceding the date as of which the assessment is made, or the average for such portion of the year that the property may be in the possession of the person assessed."

It will be seen that no method of averaging is found in the statute but it has been held in *General Motors Corp.* v. *State Board,* 125 *N. J. L.* 574; 16 *Atl. Rep.* (2*d*) 632, that "month end inventories ascertained from the taxpayer's books and records furnish a fair basis of arriving at an average."

The judgment of the Hudson County Board of Taxation, cancelling the assessment, will be reversed, and the assessment restored to the extent of $85,504.24.