P. W. DAVENPORT, Tax Collector for the City of Charlotte and Mecklenburg County, the City of Charlotte, and Mecklenburg County, Plaintiffs,

v.

RALPH N. PETERS & COMPANY, a Limited Partnership, C & T Refinery, Inc., a Corporation, and the Chase Manhattan Bank, a Banking Corporation, Defendants.

Civ. No. 1874.

United States District Court
W. D. North Carolina,
Charlotte Division.

Oct. 8, 1966.

Hamlin L. Wade, Charlotte, N. C., for plaintiff.

Thomas A. Lockhart, Charlotte, N. C., for defendant. Moncure & Cabell, Richmond, Va., of counsel.

## FINDINGS OF FACT

CRAVEN, Circuit Judge:*

From the evidence adduced at trial, all of which was offered by plaintiffs except the 145 negotiable warehouse receipts introduced by defendants, the court finds facts:

1. On March 2, 1964, plaintiffs filed complaint in the above action in which plaintiffs alleged, on information and belief, that on January 1, 1963, the defendant Ralph N. Peters & Company, hereinafter called "Peters", "was the owner" of 50 negotiable warehouse receipts, sometimes hereinafter called the "1963 receipts", each representing 60,000 pounds of cottonseed oil stored at C & T Refinery, Inc. in Charlotte, Mecklenburg County, North Carolina,

* Sworn in as United States Circuit Judge, Fourth Circuit, on July 5, 1966, and designated to sit as United States District Judge in the Western District of North Carolina to complete matters pending at time of appointment.

having an aggregate market value of $90,558.00 on January 1, 1963, and that on January 1, 1964, Peters "was the owner" of 145 said negotiable warehouse receipts, sometimes hereinafter called the "1964 receipts", having a then aggregate market value of $901,320.00, and in the complaint plaintiffs prayed the court to declare a lien "on the vegetable oil in the possession of C & T Refinery, Inc. and owned by the Defendant, Ralph N. Peters" for taxes claimed by plaintiffs on account of the vegetable oil situate in Mecklenburg County on January 1, 1963, and January 1, 1964, represented by the 1963 and 1964 receipts.

2. Also, on March 2, 1964, a temporary restraining order and attachment was signed and issued by the court in which the court ex parte found various facts from the complaint, including "that the Defendants, Ralph N. Peters and The Chase Manhattan Bank, have ownership and possession of 145 negotiable warehouse receipts indicating ownership of the property hereinafter described", and, based upon its findings, including that herein quoted, the order directed:

"2. That the United States Marshal attach the 145 tank cars of vegetable oil in possession of C & T Refinery, Inc. located at Pineville Road, Charlotte, North Carolina, and owned by the Defendant, Ralph N. Peters, by delivering a copy of the Notice of Levy, along with this Order and copy of the Complaint, to said C & T Refinery, Inc. as by law provided.

\*　　\*　　\*　　\*　　\*　　\*

"5. That pending the hearing of this Order to show cause the Defendants, their agents, servants, employees, and attorneys, be, and they are enjoined and restrained from transferring, negotiating or otherwise disposing of or encumbering the said 145 negotiable warehouse receipts."

3. A notice of levy directed to C & T Refinery, Inc. was issued by the United States Marshal pursuant to the above order, and it specified:

"You (C & T Refinery, Inc.) are notified that a lien is hereby created on all the tangible property of the Defendant, Ralph N. Peters, in your possession, and that if you surrender the possession of, or transfer to anyone, any property belonging to the Defendant, Ralph N. Peters, or if you pay any debt you owe the said Defendant, unless the same is delivered or paid to me or to the Court for such proper disposition as the Court may determine, you will be subject to punishment as for contempt, and that judgment may be rendered against you for the value of such property not exceeding the full amount of Plaintiffs' claim and costs of the action."

4. On March 13, 1964, a consent order was entered which changed the style of the case and substituted for the name "Ralph N. Peters" the name "Ralph N. Peters & Co., a limited partnership", as a proper defendant. Counsel for defendants waived requirement of additional service of process upon Peters. The temporary restraining order and attachment was "continued for a period of 30 days after the date of this order or until such time as a bond in the amount of $25,000.00 shall be filed to assure the payment of the liability, if any, of the defendants". Upon filing the bond, counsel for Peters and Chase were authorized to enter a personal appearance on behalf of said defendants. The consent order stated:

"(C)ounsel discussed and are concerned with the in rem basis of the Court's jurisdiction and by this agreement intend that the in rem basis of jurisdiction will not be defeated by reason of the substitution of a bond and the release of the attached property.

"Nothing contained herein is intended to, nor shall be construed to be a waiver of any other legal defense available to the defendants and it is their contention that there is no tax liability upon them."

5. Pursuant to the consent order, bond was filed on April 13, 1964, and the property was released from the attachment, and Ralph N. Peters & Com-

pany and The Chase Manhattan Bank, hereinafter called "Chase", made a personal appearance in the action.

6. Answer was filed by the defendants, Peters and Chase, on May 4, 1964, and an amended answer was filed by said defendants on the 11th day of February, 1966.

7. One of the plaintiffs, P. W. Davenport, is the duly appointed tax collector for the City of Charlotte and Mecklenburg County, and the other plaintiffs, City of Charlotte and Mecklenburg County, are bodies politic.

8. The matter in controversy exceeds, exclusive of interest and costs, the sum of $10,000.00. The total amount of taxes claimed by plaintiffs for the year 1963 is $1,695.25, with interest and advertising of $263.26 through the month of June 1966, for a total of $1,958.51, and taxes for the year 1964 in the amount of $18,559.91, with interest and advertising of $1,763.69 through June 1966, for a total of $20,323.60, for a combined total of taxes for both years, with interest and advertising through June 1966, of $22,282.11. (T. p. 27).

9. C & T Refinery, Inc., hereinafter called "C & T", is a Virginia corporation having its principal and only office and place of business in the State of North Carolina in Charlotte. C & T is in business to refine and make into an edible oil crude oil from soy beans, corn oil, peanut oil, and cottonseed oil—all vegetable oil. C & T refines oil purchased in "crude stage" or purchases refined oil. (Drudge Deposition, August 26, 1964, pp. 3 and 4). In addition, C & T sells "futures contracts" in cottonseed oil and is a bonded warehouse for delivery of "once refined" cottonseed oil on the New York Produce Exchange. (Drudge Deposition, August 26, 1964, p. 8).

10. C & T has large storage tank facilities at its Charlotte plant sufficient to store approximately 300 tank cars of cottonseed oil, each tank car representing 60,000 pounds of oil. When C & T is prepared to deliver the oil, it issues negotiable receipts, each representing 60,000 pounds of cottonseed oil, and sells them, as owner, through its agent or broker, on the New York Produce Exchange. All such negotiable warehouse receipts are subject to the rules of the New York Produce Exchange and the North Carolina Uniform Warehouse Receipts Act. The oil is of a fungible nature, and under the rules of the New York Produce Exchange all oil of like quality is co-mingled in storage tanks. The oil is of a nature that is subject to deterioration immediately upon refinement into the "once refined" stage, but it can remain in the storage tanks at C & T for in indeterminant time. The rules of the New York Produce Exchange require that a like grade of oil be available for delivery upon surrender of the negotiable warehouse receipts.

11. All of the receipts representing ownership of the oil which plaintiffs seek to assess with 1963 and 1964 city and county ad valorem taxes in this action were sold by C & T through its broker, Goodbody & Company. All of the 1963 and 1964 receipts stated on the face of the receipts that the oil represented by the receipts was located in the warehouse of C & T in Charlotte, North Carolina. C & T had oil stored at various locations in other states from time to time during the period in question, but C & T had at all times from the date of issuance of 1963 and 1964 receipts a sufficient amount of oil represented by the 1963 and 1964 receipts located at its storage facility in Charlotte to deliver the oil at Charlotte in the event of surrender of the receipts for the oil and the rules of the New York Produce Exchange required this. On January 1, 1963, and January 1, 1964, C & T had no other "once refined" oil stored outside of Charlotte, North Carolina. At all times during 1963 and 1964, the oil which was stored outside of Charlotte, North Carolina, was stored for the account for some other negotiable receipt or receipts than the ones in question. (Drudge Deposition, December 16, 1964, p. 12).

12. Once the 1963 and 1964 receipts were sold by Goodbody & Company, the relationship of C & T to the oil changed

from "owner" to "warehousemen". C & T did not know who bought the 1963 and 1964 receipts, but, when they were sold, C & T found out who was the recipient of the receipts, because that was the party to whom C & T began billing storage charges on the oil then held by C & T as warehouseman. (Drudge Deposition, August 26, 1964, p. 9; T. pp. 59, 64, and 65).

13. The warehouse receipts, once issued, are negotiable, and it is customary in the trade that the receipts can "trade hands freely with or without endorsement on the receipt". (T. p. 64). All of the 1963 and 1964 receipts representing the oil stored in Mecklenburg County were endorsed many times, some as many as seventeen to twenty times, and none of the endorsements are dated. None of the endorsements were to Chase Manhattan Bank, although all the receipts show storage paid through "such and such a date", implying that storage has been paid by the last endorser. (T. pp. 45 and 53). Usually the receipts are held by a broker rather than the owner (T. p. 49) and most of the endorsements on the receipts are by brokers, but not always, and the endorsements generally indicate a change in the broker holding the receipt. Storage on all of the 1964 receipts (145 receipts) was paid by Peters or by Chase for the account of Peters from September 1963 through June 1964. (Drudge Deposition, December 1964, pp. 8, 24). The total storage for the months of January through June 1964 on the 1964 receipts was $47,506.05. As the broker holds the receipt for the account of its customer, there can be changes in the ownership of the same receipt by different customers of the same broker without any change in the endorsement on the receipt itself. (T. pp. 46 and 48). C & T is not notified of changes in the ownership interest in receipts issued by it, including the 1963 and 1964 receipts, unless there is a transfer of the physical receipt and a new person or firm begins paying storage fees. (Drudge Deposition, August 26, 1964, p. 18; T. p. 50). It is not pos-

sible to ascertain by looking at the receipts who owned them on any given date, and specifically on January 1, 1963, and January 1, 1964. (T. pp. 45 and 54).

14. Once the receipts are "sold or transferred, they are supposed to be registered with the New York Produce Exchange as to who owns which receipts." The 1963 receipts were held by Peters or Chase on January 1, 1963, and the 1964 receipts were held by Peters or Chase on January 1, 1964. (Santoni Deposition, p. 25). Due to the fact that the interests in the receipts are traded from time to time, there is no way of knowing who actually has the ultimate interests in the receipts from time to time. The broker who purchases the receipts is unaware of trading by his customers of the various interests in the receipts. (Santoni Deposition, pp. 34, 50). Therefore, the interests in the receipts might be traded but the actual physical receipts for 1963 and 1964 were held by Peters or Chase.

15. C & T had no knowledge or information at anytime prior to the institution of this action who actually owned the oil represented by the 1963 and 1964 receipts, meaning on January 1, 1963, and January 1, 1964, although C & T did know that storage charges during that period were paid by Peters or Chase for the account of Peters. (Drudge Deposition, August 26, 1964, p. 18; Drudge Deposition, December 16, 1964, pp. 6 and 8; T. pp. 45, 46, 50, 51, and 54).

16. During the years 1963 and 1964, there were approximately 2,000 warehouse receipts for cottonseed oil (of the nature warehoused by C & T) outstanding in the United States, and C & T had issued in excess of 200 of them. There were in excess of 100 brokers and 50 to 100 refining companies in the United States dealing in these receipts. There was "a great deal of activity", one thousand to two thousand transactions daily, in these receipts during the year 1963. (T. pp. 46, 47, and 48).

17. On January 1, 1963, and January 1, 1964, the dates alleged in the complaint

for determining taxable situs of tangible personal property in Mecklenburg County, Peters was a limited partnership engaged in the business of a brokerage house buying and selling for the account of its cusomers (1) "futures" traded on the Chicago Board of Trade and (2) both cottonseed oil "futures" and negotiable warehouse receipts traded on the New York Produce Exchange. (Santoni Deposition, pp. 11, 12, and 13).

18. It was the custom of the trade that when the customer wanted to buy cottonseed oil negotiable warehouse receipts on credit or borrow money on receipts already owned Peters would lend the money and hold the receipts as security for the repayment of the loan. Peters made such loans from its own funds or funds borrowed by Peters from its bank, in this action The Chase Manhattan Bank, hereinafter called "Chase", in which the latter event the receipts were held by Chase as security for the repayment of the loan by Peters. (Santoni Deposition, pp. 13, 14, 16, 17, 21, 22, 23, 25, 26, 27, and 28).

19. All purchases and sales of and loans on warehouse receipts by Peters were "only on the customer's order" and for the customer's account, and, if there was any variation in the price of the oil, the profit or loss accrued to the customer and not Peters. Peters did not buy, sell, borrow, or lend money on cottonseed negotiable warehouse receipts for its own, or firm, account, and it never carried such oil in its own inventory. (Santoni Deposition, pp. 13, 28, 36, 41, 43, and 44).

20. In the purchase on credit of negotiable warehouse receipts for its customers or loans to its customers on warehouse receipts already owned by customers, as the case may have been, Peters or Chase held the receipts as security for the repayment of the loan, and the receipts were not delivered to the customer until the customer paid for them. (Santoni Deposition, pp. 14, 16, 43, and 44). Peters had actual physical control of the receipts for the purpose of pledging or otherwise using the

receipts. The loans from Chase were direct loans to Peters rather than Peters' customers, and Chase looked to Peters for repayment of loan.

21. In lending money to its customers on their order, whether Peters loaned its own money or money borrowed by it from Chase, the only interest Peters had in the receipts "is a security interest by way of a loan to a third party" (Santoni Deposition, p. 31), Peters did not consider it was the owner of the receipts prior to receiving payment from its customers (Santoni Deposition, p. 27), and the only compensation received by Peters for each transaction it handled was commissions on the purchase and sale of the receipts and interest charged by Peters on loans made by Peters to its customers (Santoni Deposition, p. 34).

22. The practice and procedure of Peters in buying and selling cottonseed oil negotiable warehouse receipts for the account of its customers and in lending money to its customers on warehouse receipts is the customary and general business practice of the entire trade, and the system used by Peters at the times pertinent to this action were similar to "a margin account for stocks on the New York Stock Exchange", and, upon each purchase or sale, Peters gave its customer "a written confirmation of that order" showing "the various aspects of the sale, of price, amount, etc., the date of the contracts"; and, when Peters paid storage on the oil represented by the receipts, Peters sent the customer "a debit advising that we are debiting their account for storage", and each month Peters sent the customer a monthly statement showing the net balance of the account reflecting the deductions for the month. (Santoni Deposition, pp. 29, 45, and 46).

23. On April 15, 1963, a 1963 Business Personal Property Listing was filed with the Tax Supervisor for Mecklenburg County in the name of "Ralph N. Peters". The names of the partners in the partnership shown on the listing were: "Laura Peters, C. Pardee Erdman, Williard E. Platt, Alfred Vermont,

Frank Erdman". Under the section on the listing entitled "Inventories As Of January 1, 1963", beside a line appearing as "Consigned Goods Carried As Part Of Your Inventory _____ 100% Cost Value $_____", was the figure "$90,-558.00". The listing was signed by "William J. Forster, Controller", who was the controller of Ralph N. Peters & Company on April 15, 1963. Mr. Forster now is a partner in the company. The 1963 business personal property listing form, along with an instruction sheet, was mailed by the Tax Supervisor's Office of Mecklenburg County to Peters.

24. The tax supervisor took the information contained on the 1963 Business Personal Property Listing filed by Peters to mean that Peters owned property situate in Charlotte, Mecklenburg County, North Carolina, on January 1, 1963, having a market value of $90,558.00, and it is customary for taxpayers to list property owned by them in this manner. (T. p. 13). On January 1, 1963, Peters had a loan of money to one of its customers, Allied Crude Vegetable Oil Refinery Corporation, a refiner of cottonseed oil, hereinafer called "Allied", and Peters held the 1963 receipts as security for the repayment of the loan. The 1963 receipts physically were at Chase as collateral for a loan Peters had made with Chase to enable Peters either to purchase the receipts for Allied or to lend Allied money on the receipts. (Santoni Deposition, pp. 12, 13, 20, 21, 22, 23, 27, 31, 32, 42, 43, and 44). Furthermore, on January 1, 1964, the receipts, which were held by Peters or Chase, were held for the account of Peters' customer, Fats and Oils Export Corporation, and Peters had purchased all of the 1964 receipts in the open market for its customer. (Santoni Deposition, p. 30).

25. The receipts held by Peters on January 1, 1963, for the account of Allied were withdrawn by Allied on April 2, 1963, when Allied paid off its loan with Peters, and the 1963 receipts were transferred to various people. The 1963 receipts changed hands several times during 1963, however, on January 1, 1964, they again were held by Peters, but for another customer, Fats and Oils Export Corporation. (Santoni Deposition, pp. 42, 47, and 48; Drudge Deposition, December 16, 1964, p. 6).

26. C & T filed a Business Personal Property Listing, dated January 1, 1964, with the Tax Supervisor for Mecklenburg County, and the listing was signed "P. L. Drudge, Vice President". Under the section entitled:

"Goods Not In Inventory Above, Consigned Or Otherwise

\* \* \*

"Name of Owner _____ Value $932,400.00

"Address see list "

and on the "list" attached to the listing, there appeared the following:

"Cottonseed Oil stored in our tanks Jan. 1, 1964:

"Ralph N. Peters & Company
208 South LaSalle Street
Chicago, Illinois $ 901,320.00

"R. J. Barnes & Son, Inc.
26 Broadway
New York 4, New York 31,080.00
 $932,400.00"

27. The reference to Peters appearing on the 1964 information listing filed by C & T was based upon the assumption by C & T that Peters owned the receipts because storage costs had been paid by it or by Chase for the account of Peters for a period including January 1, 1964. (T. pp. 45, 46, 50, 51, 54, and 59; Drudge Deposition, August 26, 1964, pp. 17, 18, and 23; Drudge Deposition, December 16, 1964, pp. 6 and 8). The tax supervisor mailed a 1964 Business Personal Property Listing to Peters several days before the end of 1963 or early in 1964, along with an instruction sheet for completing the listing, but no business personal property listing on the property in question was filed with the Tax Supervisor for Mecklenburg County for the year 1964 either by Peters or Chase (T. pp. 15, 16, and 44), and the $901,320.00 worth of oil was assessed against Peters in the amount of $540,792.00 by the tax supervisor for 1964 taxes solely on the basis of the 1964 information return of C & T (T. p. 17), and the fact is that on January 1, 1964, Peters held the 1964 receipts representing the $901,320.00 in value of cottonseed oil stored at C & T for the account of Peters' customer, Fats and Oils Export Corporation. The 1964 receipts physically were held by Chase as security for the loan Peters had made with Chase to enable its customer, Fats and Oils Export Corporation, to purchase the receipts. (Santoni Deposition, pp. 25, 26, 27, 28, 30, and 31).

28. Fats and Oils Export Corporation is a broker in cottonseed oil, and it probably held the receipts for the account of one or more of its customers, there could have been transfers of the ownership interest in the receipts among the customers of Fats and Oils Export Corporation "without this knowledge coming home to Peters", and Peters did not know who the actual owner of the oil was on January 1, 1964. (Santoni Deposition, pp. 32, 33, 34, 35, 48, 49, and 50).

29. As the broker usually holds the receipts for the account of his customer, a purchaser of these negotiable warehouse receipts would not usually know whose receipts he had bought, whether they were receipts of C & T or some other refiner, anymore than the purchaser of shares of stock would know whose shares he had acquired. (T. pp. 49, 48, 65, 66, 67, and 68).

30. The 1964 Business Personal Property Listing which was filed by C & T with the Tax Supervisor for Mecklenburg County included, in addition to the matters stated in paragraph 26 above, a total value of $186,960.74 listed by C & T as part of its own inventory. This value included some once refined oil, which was comingled with other oil of like quality owned by other persons, firms, or corporations, including possibly the oil held for the account of Peters. C & T paid taxes to Charlotte and Mecklenburg County based on the $186,960.74 valuation of property in its inventory.

31. Under the rules of the New York Produce Exchange, the warehouseman is neither required nor authorized to deliver the oil represented by the warehouse receipts, except upon tender of the receipts to the warehouseman. The warehouseman is required to keep the oil insured for its current market value against loss or injury by fire and/or lightning for the benefit of the holder of the receipt.

32. The tax assessment against Peters is a non-discriminatory tax in the sense that all property of like kind owned by residents and non-residents is assessed for taxation.

33. Peters was, on January 1, 1963, and January 1, 1964, a broker dealing in tangible personal property, and, on said dates, it had in its possession property belonging to it or belonging to others having a taxable situs in Charlotte, North Carolina, and having a market value of $90,558.00 on January 1, 1963, and having a market value of $901,320.00 on January 1, 1964.

## MEMORANDUM OF DECISION

Plaintiffs began this action on March 2, 1964, to have declared in their favor a lien on a large quantity of "once-refined" cottonseed oil in the storage tanks

of defendant C & T Refinery, Inc. (hereinafter referred to as C & T) in Charlotte, North Carolina. Plaintiffs sought to collect ad valorem taxes claimed to be owed the City of Charlotte and Mecklenburg County on the oil which had been situated in Charlotte on the pertinent tax days of January 1, 1963, and January 1, 1964. Detailed findings of fact have been separately filed. The following is a summary and recapitulation. In the event of discrepancy, the findings recited herein are intended to control.

The cottonseed oil was represented when this suit began by one hundred and forty-five negotiable warehouse receipts. The warehouse receipts were originally issued and sold by C & T through its broker on the New York Produce Exchange. C & T has since retained at all times in Charlotte, as required by the rules of the New York Produce Exchange, a sufficient amount of "once refined" cottonseed oil to deliver in the event of the surrender of outstanding receipts. The oil is of a fungible nature and, in accord with the rules of the New York Produce Exchange, has been comingled with other oil of a like quality.

The receipts after issuance are negotiable and are customarily traded to other brokers for the accounts of their customers. Receipts are traded under the rules of the New York Produce Exchange and the North Carolina Uniform Warehouse Receipts Act. Usually the physical receipts are held by the broker rather than by the actual owner, and, since interests in the receipts may be traded, it is impossible at any given time to determine the actual owner of the interests from the face of a receipt.

Plaintiffs alleged in their original complaint that the receipts were owned by the defendant Ralph N. Peters & Company (hereinafter referred to as Peters), a brokerage house which trades warehouse receipts for its customers on the New York Produce Exchange. Defendant Chase Manhattan Bank (hereinafter referred to as Chase) was alleged to have

possession of some or all the receipts as a secured creditor of Peters.

Plaintiffs asserted that defendant Peters owned on January 1, 1963, fifty warehouse receipts representing cottonseed oil stored in Charlotte with an aggregate value of $90,558.00 and owned on January 1, 1964, one hundred and forty-five warehouse receipts representing oil with an aggregate value of $901,320.00. The amount of taxes claimed by plaintiffs for the year 1963 is $1,695.25, with interest and advertising of $263.26 through the month of June 1966, and for the year 1964 is $18,559.91, with interest and advertising of $1,763.69 through June 1966, for a combined total of taxes for both years, with interest and advertising through June 1966, of $22,282.11.

After making ex parte appropriate findings, this court, on March 2, 1964, issued a temporary order attaching the cottonseed oil in the possession of C & T and restraining defendants Peters and Chase from negotiating the receipts held by them. Defendants Peters and Chase were served with copies of the complaint and court order at their offices in Chicago and New York respectively.

Subsequently, on March 13, 1964, a consent order was entered into by the parties which continued the temporary restraining order and attachment for thirty days or until a $25,000.00 bond should be "filed to assure payment of the liability, if any, of the defendants." Counsel for Peters and Chase agreed that "at the time any such bond is filed he will be authorized by the defendants to enter a personal appearance and will do so." The consent order recited that:

Counsel discussed and are concerned with the in rem basis of the Court's jurisdiction and by this agreement intended that the in rem basis of jurisdiction will not be defeated by reason of the substitution of a bond and the release of the attached property.

Nothing contained herein is intended to, nor shall be construed to be a waiver of any other legal defense available to the defendants and it is their

contention that there is no tax liability upon them.

Plaintiffs thereafter filed a bond, whereupon the attachment and temporary restraining order were dissolved. Defendants Peters and Chase then made a personal appearance in the action.

Though defendants, in their original answer, admitted ownership by Peters of the one hundred and forty-five negotiable warehouse receipts, they subsequently amended their answer to deny any ownership interest. At the trial, it was established that on January 1, 1963, and January 1, 1964, and at the institution of this action Peters did not own the ultimate interest in the receipts but had possession of them, or constructive possession and control of them, and dealt with them as broker for and as a secured creditor of the actual owner.

The fifty warehouse receipts were on January 1, 1963, in the physical possession of Peters or Chase as a secured creditor of Peters. The one hundred and forty-five receipts were likewise in their possession on January 1, 1964. It was the custom of the trade that customers would purchase warehouse receipts by taking a loan from their broker and leaving the receipts in the broker's hands as security for repayment. Peters made such loans from its own funds, and, in this instance, made such loans from funds borrowed from Chase, with whom the receipts were pledged as security. Peters had actual physical control of the receipts and could pledge or otherwise dispose of them.

C & T, as warehouseman, was not informed of changes in ownership of the receipts when traded. However, C & T was aware that Peters, or Chase for the account of Peters, paid storage charged on the cottonseed oil before and after the two critical tax days.

Peters filed a 1963 Business Personal Property Listing with the Mecklenburg County Tax Supervisor which included $90,558.00 in "consigned goods". Peters did not file a 1964 Listing; however, cottonseed oil with a value of $901,320.00

was included on an information return filed by C & T noting that the oil was being stored for Peters.

After it became apparent that defendant Peters did not "own" the oil on the two tax days, the plaintiffs requested and received leave to amend their complaint. The complaint, as amended, alleges in the alternative that defendant Peters, if not liable as owner, is liable for an amount equal to the taxes due on the vegetable oil in question because of its failure as a broker dealing in tangible property to report information regarding ownership of the oil in their possession to Mecklenburg County tax officials. Provision is made for such a penalty in N.C.G.S. § 105–317.

### I.

■ This action was instituted as a quasi-in-rem proceeding to subject the cottonseed oil in the possession of C & T to the discharge of ad valorem tax liability of Peters, who was initially alleged to own the ultimate interest in the oil. Attachment of the oil and service of process on defendants Peters and Chase beyond the borders of North Carolina was accomplished pursuant to applicable provisions of the North Carolina General Statutes. See N.C.G.S. §§ 1–98 to 1–99.1 and 1–440.1 to 1–440.20. Federal district courts have been authorized since 1963 by Rule 4(e) of the Federal Rules of Civil Procedure to utilize state provisions for bringing quasi-in-rem actions by serving non-residents after taking their property into the custody of the court. Moreover, Rule 64 of the Federal Rules of Civil Procedure sanctions use of provisional remedies, including attachment, available to state courts.

In this action, attachment of the cottonseed oil, accompanied by out-of-state service of process, was intended to advance three separate ends: First, this court would be accorded quasi-in-rem jurisdiction by subjecting to its power the property of a non-resident when personal jurisdiction could not be acquired. Second, plaintiffs would be enabled in advance of judgment to assure that any

judgment obtained would be paid by execution against the property. Third, process would run out of the state to restrain transfer of negotiable warehouse receipts, the transfer of which might invalidate the attachment.

But we now know that neither Chase nor Peters "owned" either the receipts or the oil at the time of attachment.

 The bare interest of a creditor in his chattel security is not subject to attachment; nor is any interest an agent may have by reason of the possession of his principal's property. See N.C.G.S. §§ 1–315, 1–440.4. Defendants Peters and Chase are not prevented from challenging the court's ex parte findings on which the attachment and temporary restraining order were based because of the substitution of their bond. See N.C.G.S. §§ 1–440.36, 1–440.39(d). They have shown that the attachment was erroneously ordered and are entitled to have their bond dissolved.

 Counsel for the defendants Peters and Chase have referred to the consent order entered by this court on March 9, 1964. The order stated, *inter alia*, that counsel "intend that the in rem basis of jurisdiction not be defeated by reason of the substitution of the bond and release of the attached property." This expression was included in the order to show the concern of counsel for the plaintiffs that the court's jurisdiction in the cause not be ended by release of the property which was the subject of the original action. All concerned were under a misapprehension of fact: that defendants owned the property. The language cannot properly be read to convert defendants' appearance into a "special appearance" not countenanced by the rules.

 Notwithstanding dissolution of defendant's bond, this court, by reason of the defendant's personal appearance, has judicial power over the defendants sufficient to decide the controversy. There is no such thing as a "conditional" appearance in the federal court. The time-honored ritual of a "special appearance" has no place under the rules.

Wright, Federal Courts § 66, at 243 (1963). Clearly, the defendants had the right (which they exercised) to defend on the merits and, *at the same time*, to object to the jurisdiction of the court. Rule 12(b). If they had done so seasonably (instead of twenty-three months after the complaint was filed) and had shown by affidavit or otherwise that they were without an attachable interest in the cottonseed oil, this court would have been without power to proceed to judgment *as to them*. But, it does not necessarily follow that the complaint would have had to have been dismissed. Defendants' prompt disclosure of non-ownership might have then enabled plaintiffs to discover the true owner and to substitute that owner as a party defendant so as to permit the action to proceed. Nor does it necessarily follow that the restraining order must inevitably have been vacated. It is in the very nature of garnishment and attachment that innocent third parties are sometimes restrained from further transfer and negotiation.

The question before this court is not whether defendants waived their jurisdictional objection by defending on the merits (the better rule is that they did not) but whether defendants are estopped, by reason of their failure to make the jurisdictional objection promptly and their delay of twenty-three months before making it, from asserting it after the property has been released and the restraining order dissolved.

 Counsel for defendants urge that plaintiffs have not been prejudiced by defendants' erroneous assertion of ownership for the simple reason that whenever the truth became apparent, i. e., that defendants did not own the property, vacation of the attachment would result. This argument ignores and gives no importance to the time element. If defendants had disclosed the truth in the spring of 1964 (that they did not own the property), it is not impossible that the true owner might then have been ascertained and served with process, and it is not even impossible that such owner

might at that time have been the same person or corporation owning the property on the critical day of January 1, 1964. Thus, plaintiffs have been seriously prejudiced by the (innocent) deception of defendants. Their failure to correctly ascertain ownership until almost two years later caused potentially serious detriment to plaintiffs. Defendants are estopped from asserting invalidity of the attachment as a reason for narrowing the ordinary effect of a general appearance by their failure to assert the invalidity from March 22, 1964, until February 11, 1966, and the detrimental effect thereof upon plaintiffs. In my judgment, it is not in accordance with the spirit of the federal rules to permit the defendants to convert their personal appearance into a "special appearance" on the ground that they had a jurisdictional deficiency which they might have asserted almost two years previously—but did not assert until after they had obtained by their personal appearance dissolution of the bond, the restraining order, and the attachment.

■ Defendants Peters and Chase contend that they should be allowed to withdraw from this action because it is an "entirely new or radically different cause of action" from that in which they voluntarily made a personal appearance. Plaintiffs have admittedly changed their theory for recovery since the institution of this suit. The action, however, has remained from conception a proceeding to collect ad valorem taxes due on account of the quantity of cottonseed oil stored in Charlotte on the pertinent tax days. Moreover, defendants made their appearance after agreeing that plaintiffs should look to them personally for any tax liability and not to the attached property to be released upon defendants filing a bond. Consequently, the action proceeded thereafter on an in personam basis against defendants.

■ That this court permitted plaintiffs to amend their complaint to allege alternatively defendants Peters' and Chase's liability for failure as brokers or other persons in possession of the oil to supply required information to Meck-

lenburg County tax officials does not militate for the defendants' release from the court's jurisdiction in this action. Defendants themselves conceded ownership in their initial answer. However, depositions taken by plaintiffs disclosed that defendant Peters did not own but "possessed" as broker the warehouse receipts representing the property for which taxes are sought. The court, exercising its discretion, granted plaintiffs' motion to amend their complaint to take account of this aspect of their proof and also to posit the alternative theory of liability. Rule 15(b) of the Federal Rules of Civil Procedure represents a liberal amendment policy, and amendments to conform pleadings to proof have been permitted and even required where they result in advancing a different theory of liability than that originally pleaded. E. g. Robbins v. Jordan, 86 U.S.App. D.C. 304, 181 F.2d 793 (1950); cf. Cunningham v. Jaffe, 37 F.R.D. 431 (W.D. S.C.1965); Donnelly Garment Co. v. International Ladies' Garment Workers' Union, 47 F.Supp. 61 (W.D.Mo.1941).

## II.

It is necessary to determine whether according to the law of North Carolina the cottonseed oil stored in Charlotte had a "tax situs" in the State and in Mecklenburg County on the two relevant tax days.

■ All personal property whatsoever within the jurisdiction of the State and not specifically exempted from taxation by law is subject to the taxation in North Carolina. N.C.G.S. §§ 105–279, 105–281. No statutory exemption exists for the personal property here sought to be taxed. See N.C.G.S. § 105–297. All such property is to be listed and assessed on the first day of January each year. N.C.G.S. § 105–280.

Tangible personal property of individual nonresidents taxable in North Carolina is to be listed where situated. N.C.G.S. § 105–302(c).

It is also specifically provided that tangible "property stored in public ware-

houses" is to be listed in the place where situated. N.C.G.S. § 105–302(d).

 If the oil in question is taxable in North Carolina, whether owned by a resident or nonresident individual, corporation, or partnership, the proper place for listing is the place where the commodity is being stored, Mecklenburg County.

 I conclude that the City of Charlotte and Mecklenburg County were correct in their determination that under North Carolina law the cottonseed oil in question had a tax situs within North Carolina and within their local jurisdictions. I do not read Texas Co. v. Elizabeth City, 210 N.C. 454, 187 S.E. 551 (1936), and Mecklenburg County v. Sterchi Bros. Stores, 210 N.C. 79, 185 S.E. 454 (1936), as being to the contrary.

### III.

Defendants Peters and Chase contend that the imposition of an ad valorem tax on the cottonseed oil in question is placing a "tax directly upon interstate commerce" and thereby runs afoul of the Commerce Clause in the federal Constitution. Defendants' theory is that the property sought to be taxed is located in contemplation of law at the domicile of the owner of the warehouse receipts representing the oil. Consequently, defendants contend the property was "consistently in transit, changing hands from place to place" with the negotiation of the receipts.

 The plaintiffs are not seeking to collect a tax on the negotiation of the receipts or on the physical receipts themselves but on the cottonseed oil stored in Charlotte. The property being taxed was physically situated within Mecklenburg County. The warehouse receipts, as such, are merely symbols of the property or ownership of the goods covered by them. 56 Am.Jur. "Warehouses" § 29; 93 C.J.S. "Warehousemen and Safe Depositories" § 16b. They are "keys to the goods", in the words of Mr. Justice Holmes. Selliger v. Kentucky, 213 U.S. 200, 206, 29 S.Ct. 449, 53 L.Ed.

761 (1909). The property represented by the receipts remains in law, therefore, at the place where physically located.

 I assume for purposes of this opinion, although it has not been shown, that the cottonseed oil was in interstate commerce before being stored in Charlotte and has returned or will return to interstate commerce. Even so, interstate movement was sufficiently interrupted when the oil was stored in Charlotte that it lost the immunity acquired by property in transit and became subject to state taxation. The controlling rules are stated by Mr. Chief Justice Hughes in his opinion for the Court in State of Minnesota v. Blasius:

> "If the interstate movement has begun, it may be regarded as continuing, so as to maintain the immunity of the property from state taxation, despite temporary interruptions due to the necessities of the journey or for the purpose of safety and convenience in the course of the movement. * * *

> "Where property has come to rest within a state, being held there at the pleasure of the owner, for disposal or use, so that he may dispose of it either within the state, or for shipment elsewhere, as his interest dictates, it is deemed to be a part of the general mass of property within the state and is thus subject to its taxing power." 290 U.S. 1, 9, 54 S.Ct. 34, 37, 78 L.Ed. 131 (1933).

 Characteristic of the cases where as against constitutional challenge taxation has been upheld of property emerging from the stream of commerce are the following: that the goods are fungible; that at the time the tax is assessed the ultimate destination or use of the property cannot be determined; and that the duration of the break in transit is indefinite. Independent Warehouses, Inc. v. Scheele, 331 U.S. 70, 80, 67 S.Ct. 1062, 91 L.Ed 1346 (1946); see Susquehanna Coal Co. v. City of South Amboy, 228 U.S. 665, 33 S.Ct. 712, 57 L. Ed. 1015 (1913); Bacon v. Illinois, 227 U.S. 504, 33 S.Ct. 299, 57 L.Ed. 615

(1913); General Oil Co. v. Crain, 209 U.S. 211, 28 S.Ct. 475, 52 L.Ed. 754 (1908); Brown v. Houston, 114 U.S. 622, 5 S.Ct. 1091, 29 L.Ed. 257 (1885). The circumstances in the present case reveal the same characteristics. The oil is fungible; its disposition was unknown; and the length of its storage in C & T's facilities was indefinite when C & T issued the negotiable receipts and when the ad valorem taxes were assessed. The oil was not in storage as an incident of an interstate journey, but was placed in storage by C & T initially for purpose of sale and maintained there at the pleasure of the owner for whatever disposition he wished to make. More than one third of the total quantity of the cottonseed oil remained in Charlotte in excess of one full year, and all of it was comingled with like oil on which C & T paid ad valorem taxes. Thus, the oil was for purposes of taxation a part of the "general mass" of property within the State subject to taxation.

### IV.

Though defendants Peters and Chase do not have an ownership interest in the cottonseed oil in question, North Carolina law provides that:

"[A]ll brokers dealing in tangible personal property who have in their possession such property belonging to others, shall file with the supervisor of taxation of the county in which such property is located a full and complete list of the owners of such property, together with the amount of such property owned by each * * *. (B)rokers failing to make such reports shall be liable to payment of the tax * *." N.C.G.S. § 105–317.

Defendant Chase is not a broker and, hence, can have no liability under this statute. Chase held the warehouse receipts solely as a secured creditor of defendant Peters. Peters' liability is considered in the remainder of this opinion.

Section 105–317 of the General Statutes, though enacted in 1935, has not been construed by the courts of North Carolina. It is necessary, therefore, for this court to apply the statute in the present controversy without guidance from prior interpretation by the North Carolina courts. Defendant Peters admits it is a broker and that it traded warehouse receipts representing commodities for the accounts of its customers. Peters did not file with the Mecklenburg County tax officials a list containing the names of owners of the cottonseed oil stored with C & T on January 1, 1963, and January 1, 1964.

Furthermore, the court finds that Peters, in purchasing and selling warehouse receipts for the accounts of its customers, was dealing in tangible property within the intendment of the statute. See N.C.G.S. § 105–272(10)–(11). A warehouse receipt is merely a symbol of the physical property it represents, and the negotiation of the receipt, like delivery of a deed to real estate, passes ownership in the tangible property. Peters was, in fact, purchasing cottonseed oil for its customers.

Defendant Peters must have been in possession of the cottonseed oil on the relevant tax days in order to be held liable for payment of the taxes. *Possession* is a word of some flexibility and must here be interpreted as used in § 105–317. This court believes, and so holds, that possession, as used in this statute, encompasses Peters' relationship to the cottonseed oil in the present case.

Delivery of a warehouse receipt by the warehouseman transfers constructive possession as well as title of the property to the holder of the receipt. 93 C.J.S. "Warehousemen and Safe Depositories" § 24c. Peters acquired, therefore, constructive possession of the property represented by the receipts when they were negotiated to Peters in the present case. It is undeniably true that Peters' control over the warehouse receipts and the oil represented by them was plenary —subject only to the security interest of Chase. In exercising control over the use of the receipts, Peters had access to and

control over the cottonseed oil itself. See N.C.G.S. § 27-13(b).

Peters, while in possession of the receipts, took advantage of their value and assumed attendant liabilities. Peters used them as collateral for a loan from Chase. Storage charges were paid C & T by Peters, or for the account of Peters, and Peters accordingly debited its customer's account for storage. Monthly statements were sent by Peters to its customers reflecting deductions for the period and showing the net balance. Under these circumstances, Peters had "possession" of the cottonseed oil for ad valorem tax purposes, and C & T in law was a mere custodian of the property.

My conclusion—admittedly not free of conceptual difficulty—is strongly buttressed by the practical aspects of the business: C & T treated Peters as if the latter were absolute owner, and, indeed, knew of no other. Plainly, custodians of oil like C & T deal almost entirely with brokers, and it is the brokers, rather than "owners", who exercise the powers of possession, control, and disposition of both receipts and oil. The average trader (owner) accepts on faith in the broker the very existence of the oil and doubtless seldom ever sees it or even the receipt representing it. Seldom would an "owner" know or care where "his" oil is located.

That this is so may be inferred from the rather strange circumstance that Peters itself was unable to correctly appraise its true interest in the oil until nearly two years after filing, through competent counsel, an erroneous admission of ownership. This plainly teaches that ownership is of no importance in this business with respect to control over the commodity—perhaps because ownership changes so fast it is merely reflected in bookkeeping entries and undated stamps on the back of the receipts.

"Possession means having something in one's power." Rodella v. United States, 286 F.2d 306, 311 (9th Cir. 1960). It is in this sense that the legislature used the term in putting a duty upon brokers.

Peters, better than any other, knew, or should have known, the "owner" on the critical dates. It is not an unreasonable burden to require ascertainment and disclosure. Peters had an alternative. Peters could have disclosed the names of the actual "owners" of the property, or it could have paid the taxes due, as it did the storage costs, and then have charged them back against its customers.

Peters, as a broker, assumed full responsibility for the payment of storage charges. It is an absurdity to suppose that Peters would attempt to treat C & T as it attempts to treat the tax entities, i. e., we won't pay storage because we don't "own" the receipts, nor will we even tell you who does own them.

I conclude that Peters has made itself liable for payment of the tax by its failure to comply with its statutory duty to report ownership of the oil.

In realty transactions, ad valorem taxes are commonly prorated over the calendar year. I suspect storage charges on cottonseed oil are prorated over the calendar month. I perceive no valid reason why the commodities futures business cannot adjust the impact of the ad valorem tax in like manner. If the brokers who are in complete control of such commodities are subjected to tax liability, it is not naively optimistic to hope that the industry will someday accomplish an equitable proration. Until that day, it is not impossible that Peters will be able to recoup its loss from the true owner—but that, admittedly, is in the realm of speculation.

An appropriate judgment will be entered pursuant to this memorandum of decision.